[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Carter*, Slip Opinion No. 2024-Ohio-1247.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-1247

THE STATE OF OHIO, APPELLEE, *v*. CARTER, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Carter*, Slip Opinion No. 2024-Ohio-1247.]

*Criminal law—Sixth Amendment—Right to face-to-face confrontation—Harmless error—Trial court erred in allowing witness to testify by video at trial without making sufficient case-specific findings of necessity, in violation of defendant's right to face-to-face confrontation under Confrontation Clause of Sixth Amendment to United States Constitution—In light of other evidence presented against defendant at trial, confrontation error was harmless—Court of appeals' judgment affirmed.*

(No. 2023-0156—Submitted September 27, 2023—Decided April 4, 2024.)

APPEAL from the Court of Appeals for Logan County,

No. 8-22-12, 2022-Ohio-4559.

_____

**DEWINE, J.**

**{¶ 1}** This case involves a criminal defendant's right to confront the witnesses against him under the Confrontation Clause of the Sixth Amendment to the United States Constitution. A jury found Eli Carter guilty of having sexual relations with his adopted daughter. Eli complains that his right to face-to-face confrontation was violated because the trial court allowed a witness to testify remotely by way of video conference.

**{¶ 2}** We agree that the trial court erred by allowing the remote testimony. Under United States Supreme Court precedent, a trial judge may only dispense with the requirement of face-to-face confrontation in narrow circumstances. But the trial court in this case did not make sufficient findings to establish that such circumstances existed.

**{¶ 3}** Our conclusion that the trial court erred by permitting the remote testimony does not end our inquiry. We also must determine whether the remote testimony prejudiced Eli. We find that the use of videoconferencing was harmless error. Based on the other evidence presented at trial, there was no reasonable possibility that the trial court's error in allowing the remote testimony contributed to Eli's conviction.

## I. BACKGROUND

**{¶ 4}** In 2023, a jury found Eli guilty of two counts of sexual battery of his adopted daughter, N.C, in violation of R.C. 2907.03(A)(5). The law under which Eli was convicted criminalizes incest; it is a crime to have sexual conduct with one's natural or adopted child, regardless of the child's age. *See id.*

### A. N.C. is adopted by the Carter family and later reports that Eli had sexually abused her

**{¶ 5}** N.C. testified at trial that she grew up in foster care, having been placed in the system when she was two days old. Over the first 14 years of her life, she had nearly 40 different placements before she entered the Adriel School in West

Liberty. Adriel is a residential facility for children who have suffered abuse or trauma. The institution provides schooling as well as clinical treatment.

{¶ 6} Eli and his wife, Liz, were "teaching parents" at Adriel. They developed a relationship with N.C., who was a "[g]ood student" and "[e]asy to get along with." When N.C. was about 15 or 16 years old, the Carters brought her into their home as a foster child. They adopted N.C. the next year, in 2007. According to N.C., being adopted felt "like the dream that I had always wanted * * *. I felt like I actually had somewhere that I belonged. I was happy."

{¶ 7} But by N.C.'s account, the dream did not turn out the way she had hoped. N.C. testified that Eli began to sexually abuse her. At first, she noticed Eli would stand outside of the bathroom window while she was inside. Eli "played around a lot"—grabbing the inside of her thigh and squeezing it to the point that it bruised, ripping off her bra, and giving her "wedgies." Once the abuse started, it only got worse. Eli had a "man cave" where he would play video games. N.C. described an encounter there when Eli put his hands down her pants and rubbed her vagina. Days later, Eli had intercourse with her for the first time. After that, N.C. explained, Eli had intercourse with her on many other occasions over the next several years and forced her to engage in a variety of other sexual acts.

{¶ 8} N.C. testified that sometimes when Eli would touch her inappropriately, she would push him away, but most of the time she endured the abuse because she felt she "had to let him do that * * * to sustain being part of that family." Indeed, Eli had warned N.C. that if she told anyone about the sexual abuse, she "wouldn't have a family anymore."

{¶ 9} N.C. went away to college at Urbana University in 2008. But, by her account, the abuse persisted. Eli continued to have sexual relations with N.C. when she returned home on weekends, in her college dorm room, and in his truck.

{¶ 10} Eventually, N.C. could not endure the abuse anymore and stopped returning home. And in 2010, she told Liz Carter and Eli's brother, Travis, about

what Eli had done. The day after she told Liz, N.C. reported her father's sexual abuse to the police. The officer who took the report made an audio recording of N.C.'s statement and forwarded it to the department's detectives. But the detective assigned to the case failed to investigate the allegations.

{¶ 11} In 2017, N.C. contacted the prosecutor's office about her 2010 police report and spoke to Detective Dwight Salyer, who had inherited the case from the detective to whom it was initially assigned. Ultimately, Detective Salyer reopened the investigation and obtained evidence corroborating N.C.'s account. A grand jury indicted Eli on three counts of rape and three counts of sexual battery. The indictment covered three different time periods: (1) December 20, 2006, to December 19, 2007; (2) December 20, 2007, to December 19, 2008; and (3) December 20, 2008, to December 19, 2009. It alleged a single count of rape and a single count of sexual battery for each period.

### B. The trial court allows a state witness to testify by video

{¶ 12} Eli's jury trial began on February 9, 2022. A couple days before trial, the state moved to allow Michael Mullins to testify by video. Mullins served as CEO of Adriel School when Eli worked there. The state represented that Mullins now lived in Minnesota and argued that he should be allowed to testify remotely because of "the increase in COVID spread and uncertain weather conditions."

{¶ 13} The trial court granted the motion over Eli's objection. The court observed that the COVID-19 "pandemic and labor shortages at airlines resulting from the pandemic" had made "travel by air uncertain on a daily basis." And it explained that "[w]eather is unpredictable and could delay or prohibit [Mullins] from reaching Logan County to testify in person." Further, it noted that the state had identified Mullins as "an important witness" and found that his testimony would be "relevant and admissible as admissions of the [d]efendant." From these findings, the trial court determined that "the fact specific circumstances of this

4

case" rendered Mullins "unavailable to testify in person" and that the video format would not hinder the defense's ability to cross-examine him.

### C. The evidence at trial

{¶ 14} The state called N.C. as one of its six witnesses at the in-person trial. N.C. described the abuse in detail and testified that she endured it to prevent her return to foster care.

{¶ 15} Lieutenant Scott Marlow testified that in June 2010, N.C. filed a police report detailing her sexual-abuse allegations and made a recorded statement. Detective Salyer testified that the detective initially assigned to the case, Detective Scott Sebring, had notified Children's Services about the 2010 allegations but did not otherwise investigate them.

{¶ 16} Detective Salyer explained that he spoke with N.C. in 2017 after she reached out to his department about her 2010 police report. At Detective Salyer's suggestion, N.C. called the Carters from the police station to see if they would talk about the abuse, but they did not answer.

{¶ 17} Detective Salyer testified that in 2020, he received an inquiry about Eli from a West Liberty school where Eli had been hired as teacher. This event prompted Detective Salyer to investigate N.C.'s earlier allegations. After confirming with N.C. that she still wished to pursue the matter, Detective Salyer interviewed several persons, including Liz, Liz's siblings, Travis Carter, and Mullins. Detective Salyer documented the information he obtained in the interviews, and stated that it corroborated N.C.'s account.

{¶ 18} Miranda Borland, a Logan County Children's Services administrator, testified that a woman called her office in 2010 to report Eli's sexual abuse of N.C. Borland recounted that the woman had said that she learned about the allegations from Travis. Borland said that Travis had also called the agency to report the abuse. Because N.C. was 20 years old at the time of the reports, and

because Children's Services only investigates abuse reports involving minors, Borland referred the matter to law enforcement but took no further action.

{¶ 19} The state also called Kurt Penhorwood, Eli's former friend, who interacted with Eli regularly in Spring 2021. Penhorwood recounted that he had had "a lot of conversation[s]" with Eli about N.C.'s accusations. According to Penhorwood, Eli "basically denied it" during those conversations, saying "I didn't do what she accused me of." Penhorwood testified that Liz was present on one occasion, and she asked Eli, "[A]re you going to tell Kurt the one thing that did happen?" When Penhorwood asked Eli what he meant by his statement that he did not do what N.C. had accused him of, Eli responded, "[I]f it was consensual, why I am getting charged with rape?" Penhorwood testified that this statement made him feel morally obligated to contact law enforcement, explaining that "if you know the truth and don't come forward then you're just as guilty as someone who would lie about the truth."

{¶ 20} Mullins was the state's only witness to appear by video. He testified using his cellphone. As the court was testing the video equipment, Mullins revealed that his phone had captioning software that translated speech to text. Eli's counsel objected to the use of this software. The court overruled the objection but instructed Mullins to rely only on "the verbal communication" and that if he did not understand anything, he should ask that it be repeated.

{¶ 21} Mullins testified that in 2010, Eli's brother and sister-in-law—both of whom also worked at Adriel School at that time—notified him of allegations that Eli had sexually abused N.C. Mullins then arranged a meeting with Eli in his office. According to Mullins, Eli "simply walked into the office, made a statement that it was true, that he did engage in a sexual relationship with [N.C.] but it was consensual and it was after the age of 18, and he said I resign, and he walked out of the office."

{¶ 22} Karen Fowler, a former behavioral-health therapist at Adriel School, testified that Mullins informed her about the allegations. She testified that following Mullins's meeting with Eli, she reached out to N.C. to discuss resources that were available to assist her.

{¶ 23} The defense called only Eli. He denied N.C.'s allegations and blamed them on her childhood trauma in foster care, failure to take prescription medications, and belief that he and Liz owed her money. He said that he had never been home alone with N.C. Eli also denied having had personal conversations with Penhorwood about the sexual-abuse allegations. But he admitted to having asked Penhorwood in the presence of Liz how he could be charged with rape if N.C. had consented to sexual activity. Eli maintained that this statement did not constitute an admission that he had engaged in consensual sex with N.C., saying, "I never admitted to anything." Rather, he characterized that question as one about the "legal standard." He also testified that Mullins "misremembered" their conversation in Mullins's office and that he did not admit during the meeting to having had consensual sex with N.C. Eli said that he did not resign during the meeting but instead quit several days later so that the allegations would not negatively impact Adriel School.

**D. Eli is convicted, and his convictions are affirmed on appeal**

{¶ 24} The jury found Eli guilty of two counts of sexual battery. It found him not guilty of the three rape charges and not guilty of the sexual battery charge alleged to have occurred from December 20, 2006, through December 19, 2007.

{¶ 25} Eli appealed to the Third District Court of Appeals. He argued that Mullins's remote testimony violated his constitutional right to confront the witnesses against him. 2022-Ohio-4559, ¶ 6-7. The court of appeals rejected Carter's arguments and affirmed the trial court's judgment. *Id.* at ¶ 31. It noted that the trial court had found that airline-labor shortages and other causes were creating unprecedented travel delays. *Id.* at ¶ 15. The court further stated that even

if it "were to assume without deciding that the possibility of inclement weather was insufficient to warrant an exception" for Mullins's video testimony, "the trial court's determinations were justified on a case-specific finding based upon an important public policy involving the COVID pandemic." *Id*. at ¶ 16. Citing statistics provided by Eli in a trial-court filing, the court of appeals concluded that Minnesota's seven-day average for new COVID-19 cases was "*more than* three times" that of Ohio's around the time of trial. (Emphasis in original.) *Id.* Based on that conclusion, the court of appeals found it "evident" that the trial court had "considered the needs of the public and the trial court including all staff, the attorneys, and most importantly, members of [the] petit jury, from exposure to COVID." *Id.* Thus, it concluded that "the combination of the pandemic and resultant airline-labor shortages were sufficient bases to justify the trial court's determination." *Id.* at ¶ 18.

## II. ANALYSIS

{¶ 26} We accepted Eli's appeal on a single proposition of law, which asserts that "a criminal defendant's right to due process is violated when a witness is permitted to testify by remote means utilizing a speech-to-text caption program in the absence of any important state interest, public policy, or case necessity." *See* 169 Ohio St.3d 1489, 2023-Ohio-1149, 206 N.E.3d 735. Although Eli's proposition of law refers to his due-process rights, his arguments are based on the right to face-to-face confrontation. So we will focus on the constitutional provisions concerning confrontation.

### A. Confrontation rights under the Ohio and federal Constitutions

{¶ 27} The Sixth Amendment to the United States Constitution protects the right of a criminal defendant "to be confronted with the witnesses against him." The "primary object" of this provision is to prevent unchallenged testimony from being used to convict an accused—a safeguard that applies to both federal and state prosecutions. *Mattox v. United States*, 156 U.S. 237, 242, 15 S.Ct. 337, 39 L.Ed.

8

409 (1895); *Crawford v. Washington*, 541 U.S. 36, 42, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The provision encompasses the rights to have a witness physically appear in the courtroom, to require the witness to testify under oath, and to force the witness to be subject to cross-examination. *See Maryland v. Craig*, 497 U.S. 836, 845-846, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Importantly, it has been understood to "guarantee[] the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *see also California v. Green*, 399 U.S. 149, 157, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (explaining that face-to-face confrontation "forms the core of the values furthered by the Confrontation Clause").

{¶ 28} In *Craig*, the United States Supreme Court held that the Confrontation Clause does not guarantee "criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (Emphasis in original.) *Craig* at 844. At issue in *Craig* was a Maryland procedure that allowed a child who was allegedly abused to testify against the accused by one-way closed-circuit television. *Id.* at 840. Approving that procedure, the court held that the "central concern" of the Confrontation Clause is to ensure the reliability of testimony by "subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845. The court characterized the clause as " 'reflect[ing] a *preference* for face-to-face confrontation at trial' " (emphasis in original), *id.* at 849, quoting *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that " 'must occasionally give way to considerations of public policy and the necessities of the case,' " *id.*, quoting *Mattox* at 243. Thus, the court held that face-face-confrontation could be dispensed with only in limited circumstances "where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

**{¶ 29}** The *Craig* court deemed the state's interest in protecting child witnesses from trauma sufficiently important to justify allowing a child-abuse victim to testify without face-to-face confrontation. *Id.* at 855. But the finding of necessity "must of course be a case-specific one." *Id.* "The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* Further, measures must be taken to ensure that "the reliability of the testimony is otherwise assured" at trial. *Id.* at 850. Specifically, the witness's testimony should be subject to cross-examination and delivered under oath before the trier-of-fact. *Id.* at 845-846.

**{¶ 30}** A subsequent decision of the United States Supreme Court casts some doubt on the holding in *Craig*. In *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the court held that the Confrontation Clause prohibited the use of out-of-court statements that are testimonial in nature. In reaching this holding, the court relied on the original understanding of the Confrontation Clause, *Crawford* at 50-51, 53-56, 60-61, and rejected reliance on public-policy concerns and indicia of reliability in the Confrontation Clause analysis, *Crawford* at 68 ("we decline to mine the record in search of indicia of reliability"). The court identified the right to confront the accused "face to face" as central to the confrontation right. *Id.* at 43-45. And although the majority did not refer to *Craig*, it rejected the interest-balancing approach employed in that decision. *Crawford* at 67-68 ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design").

**{¶ 31}** The majority in *Crawford* did not overrule or even mention *Craig*. It did, however, overrule *Roberts* regarding testimonial statements, *Crawford* at 60-64, 68, a case that *Craig* heavily relied on to justify its holding, *see Craig*, 497 U.S. at 845, 849-850, 110 S.Ct. 3157, 111 L.Ed.2d 666. Numerous courts and commentators have noted the inherent tension between *Craig* and *Crawford*. *See,*

10

*e.g.*, *United States v. Cox*, 871 F.3d 479, 492 (6th Cir.2017) (Sutton, J., concurring) ("these two opinions would give Janus a run for his money"); *Campbell v. Commonwealth*, 671 S.W.3d 153, 160 (Ky.2023) (noting "the contradiction between *Craig* and *Crawford*"); Cook, *Why the Original Meaning of the Confrontation Clause Governs the Admissibility of Video Testimony at Criminal Trials*, N.Y.U. Proceedings (Apr. 20, 2023), https://proceedings.nyumootcourt.org /2023/04/why-the-original-meaning-of-the-confrontation-clause-governs-the-admissibility-of-video-testimony-at-criminal-trials/ (accessed Feb. 8, 2024) [https://perma.cc/FU8S-9C9V]. And at least one state supreme court has determined that in light of the tension between the two cases, it will apply *Craig* only to the specific facts it decided—namely, the remote testimony of a child victim. *People v. Jemison*, 505 Mich. 352, 365, 952 N.W.2d 394 (2020).

{¶ 32} In his briefing to this court, Eli also cites the Ohio Constitution. Article I, Section 10 of the Ohio Constitution contains confrontation language different from that of the federal guarantee. The Ohio provision provides that a criminal defendant "shall be allowed * * * to meet the witnesses face to face." *Id.* We have recognized that face-to-face confrontation allows an accused to cross-examine and observe a witness under oath before the jury. *See Summons v. State*, 5 Ohio St. 325, 341 (1856) ("When the accused has been allowed to confront, or meet face to face, all the witnesses called to testify against him on the trial, the constitutional requirement has been complied with"); *see also* Steven H. Steinglass & Gino J. Scarselli, *The Ohio State Constitution* 146 (2d Ed.2022).

{¶ 33} One might argue that because of its explicit textual recognition of the right to face-to-face confrontation, the Ohio provision provides rights to the accused greater than those recognized by the United States Supreme Court in *Craig* regarding the federal guarantee. But in 1980, this court dismissed the proposition that "the Ohio constitutional provision is more demanding of a face-to-face confrontation than that of the United States Constitution." *State v. Madison*, 64

11

Ohio St.2d 322, 330, 415 N.E.2d 272 (1980). And in 1990, this court held that Article I, Section 10 "provides no greater right of confrontation than the Sixth Amendment," *State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990), and noted that our interpretation of the Ohio provision "paralleled" the United States Supreme Court's interpretation of the federal guarantee, *id.* at 78. *Accord State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 170, fn. 8; *but see Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus ("The Ohio Constitution is a document of independent force" and—subject to the Supremacy Clause—we are "unrestricted" in interpreting it independently from the United States Constitution); *Madison* at 333 (Brown, J., dissenting) (observing that Article I, Section 10 "give[s] a defendant greater rights to confrontation and cross-examination" than the Sixth Amendment). *Self* followed the United States Supreme Court's precedent in *Craig* and upheld the use of a videotaped deposition of a child sexual-abuse victim based on case-specific findings of necessity. *Self* at 77-81.

{¶ 34} Eli has not asked us to revisit our decision to interpret Article I, Section 10 in lockstep with the United States Supreme Court's interpretation of the Sixth Amendment. Instead, he relies almost exclusively on federal Sixth Amendment case law. Because neither party has argued for an independent reading of Article I, Section 10, we are constrained to review Eli's argument under the federal standard. *See State v. Burroughs*, 169 Ohio St.3d 79, 2022-Ohio-2146, 202 N.E.3d 611, ¶ 11.

**B. The trial court erred by allowing Mullins to testify remotely**

{¶ 35} We need not resolve the tension between the United States Supreme Court's decisions in *Crawford* and *Craig* to decide this case. We are bound to follow the holdings of the high court on issues of federal constitutional law, and we leave to that court "the prerogative of overruling its own decisions," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104

L.Ed.2d 526 (1989). Further, even under the interest-balancing framework established in *Craig*, the trial court erred by allowing Mullins to testify without affording Eli the benefit of face-to-face confrontation.

{¶ 36} *Craig* requires a "case-specific finding" based on evidence presented by the parties that an exception to face-to-face confrontation is "necessary to further an important state interest" or "public policy" objective. *Craig*, 497 U.S. at 850, 852, 855, 110 S.Ct. 3157, 111 L.Ed.2d 666; *see also In re H.P.P.*, 8th Dist. Cuyahoga Nos. 108860 and 108861, 2020-Ohio-3974, ¶ 21-22; *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, ¶ 14. Here, the trial court's findings were inadequate.

{¶ 37} The trial court found Mullins "unavailable" to testify in person due to "unpredictable" winter weather and "uncertain" airline schedules that "could delay or prohibit" travel from Minnesota to Ohio. The state sought permission for Mullins to testify by video "[b]ecause of the increase in COVID spread and uncertain weather conditions." We agree with Eli that these findings at most recite potential weather-related inconveniences that could have hindered travel but did not necessarily prevent Mullins from testifying in person. After all, the record does not rule out the possibility that Mullins could have booked an on-time flight to testify at trial. The trial court heard no evidence about winter weather patterns, delayed flights, aviation reports (concerning Ohio or Minnesota), road conditions, or airline-staffing shortages. *Compare State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433, ¶ 58-59 (2d Dist.) (testimony about airline schedules supported trial court's finding that a witness was unavailable to testify in person); *see also State v. Johnson*, 195 Ohio App.3d 59, 2011-Ohio-3143, 958 N.E.2d 977, ¶ 61-64 (1st Dist.) (trial court found that witness intimidation by the defendant's friends and family made video testimony necessary to preserve reliability of testimony of certain witnesses). Nor did the state present an affidavit from Mullins explaining why he could not travel. The trial court's simple observation that winter weather

is "unpredictable" was not a "*case-specific* finding of necessity," (emphasis added) *Craig* at 860, because erratic weather patterns and the delays they cause are equally relevant to *any* trial involving nonlocal witnesses.

{¶ 38} Further, the record does not establish that allowing Mullins to testify remotely advanced an important state interest. The trial court noted that the state had identified Mullins as an important witness. But surely, being an important witness cannot by itself satisfy the "important state interest" requirement. *See id.* at 852. If it did, the exception to face-to-face confrontation would swallow the rule.

{¶ 39} In *Craig* and *Self*, the important state interest at stake was protecting a vulnerable child victim from severe emotional trauma. *Craig*, 497 U.S. at 852-853, 110 S.Ct. 3157, 111 L.Ed.2d 666; *Self*, 56 Ohio St.3d at 80-81, 564 N.E.2d 446. Quite simply, avoiding travel delays and inconvenience does not constitute a state interest anywhere near the same magnitude as that involved in *Craig* and *Self*.

{¶ 40} The Third District took a different approach. It determined that the public-policy interest in mitigating the spread of COVID-19 justified allowing Mullins to testify by video. *See* 2022-Ohio-4559 at ¶ 16-19. The court of appeals did not identify any findings suggesting that Mullins had a heightened risk of contracting COVID-19 but instead pointed to the *potential* risk to the attorneys, jurors, and court staff of infection. The state asks us to affirm this ruling, arguing that surging COVID-19 cases across the United States in January and February 2022 justified Mullins's remote testimony as a matter of public policy. But this argument misapprehends what we must decide. The question is not whether a spike in COVID-19 amounted to a public-policy concern generally but whether requiring Mullins to testify in person would have presented a danger sufficient to override Eli's right to face-to-face confrontation.

{¶ 41} Here, the trial court made no specific findings regarding the risk of infecting court attendees with COVID-19 had Mullins appeared at trial. The court of appeals relied on data purportedly reflecting that "Minnesota's seven-day

average was more than three times the Ohio Covid-case average" to conclude that the risk of infection warranted the video testimony. (Emphasis deleted.) *Id.* at ¶ 16. But this data alone does not establish that requiring Mullins to testify in person would have measurably increased the danger to trial participants.

{¶ 42} First, we note that the entire jury trial took place in in the courtroom, except for Mullins's testimony. To say that the trial court's "duty to protect those who come and go from the courthouse," *id.* at ¶ 17, somehow required Mullins to testify by video but did not also require the *entire trial* to be conducted remotely or any other countermeasures like masking or social distancing seems far-fetched.

{¶ 43} Second, nothing in the record establishes that Mullins posed a *unique* threat to anyone else in the courtroom other than that he would be traveling from Minnesota. No evidence suggests that he had the virus at the time of trial, that he had been exposed to it, or that he was unvaccinated. Rising COVID-19 cases in Minnesota is too general an observation to support a case-specific finding that requiring Mullins to testify in person would jeopardize the health of anyone involved with the trial.

{¶ 44} Third, by the time that Eli's trial began in 2022, vaccines against COVID-19 had been available for over a year. These vaccines mitigated at least some of the public-policy concerns associated with the virus. *See* Office of the Governor, *COVID-19 Update: Vaccinations Begin in Ohio* (Dec. 14, 2020), https://governor.ohio.gov/media/news-and-media/covid19-update-12142020 (acce-ssed Feb. 8, 2024); *compare United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir.2021) (vaccine availability "makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release"); *United States v. Traylor*, 16 F.4th 485, 487 (6th Cir.2021) (same).

{¶ 45} Thus, we conclude that the lower courts' generalized concerns about COVID-19 risks and travel delays did not constitute a "case-specific finding of

necessity," *Craig*, 497 U.S. at 860, 110 S.Ct. 3157, 111 L.Ed.2d 666, sufficient to abridge Eli's right to face-to-face confrontation.[1]

## C. The trial court's error was harmless given the remaining evidence at trial

{¶ 46} Our determination that the trial court erred in admitting the remote testimony does not end our inquiry. We must also determine whether the trial court's error was harmless. *Delaware v. Van Arsdall*, 475 U.S. 673, 674, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("While we agree that the trial court's ruling was contrary to the mandate of the Confrontation Clause of the Sixth Amendment, we conclude that the Supreme Court of Delaware was wrong when it declined to consider whether that ruling was harmless in the context of the trial as a whole"); *Coy*, 487 U.S. at 1021-1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (denial of face-to-face confrontation is subject to harmless-error review).

{¶ 47} The United States Supreme Court has explained that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We have deemed Confrontation Clause violations harmless when " 'the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt.' " (Brackets added in *Hood*.) *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 43, quoting *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus. Overwhelming proof becomes readily apparent when "the allegedly inadmissible statements * * * at most tend[] to corroborate certain details" of the state's case-in-chief. *Schneble v. Florida*, 405 U.S. 427, 431, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). Accordingly, the admission of purely cumulative evidence in violation of the Sixth Amendment amounts to harmless

---

1. Because we conclude that the trial court erred by admitting Mullins's remote testimony, we need not consider Eli's additional argument that the trial court erred by not requiring that Mullins turn off the speech-to-text captioning on his phone.

error. *See Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Smith*, 49 Ohio St.3d 137, 143, 551 N.E.2d 190 (1990) ("Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required").

{¶ 48} Here, the jury found Eli guilty of two counts of sexual battery because it concluded that he had engaged in sexual conduct with his daughter. *See* R.C. 2907.03(A)(5). "Sexual conduct" includes "vaginal intercourse between a male and female" or "the insertion, however slight," of any body part "into the vaginal * * * opening of another." R.C. 2907.01(A). The statute makes no exception for the child's consent or the child's age. *See State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 15; R.C. 2907.03(A)(5).

{¶ 49} Stripping away Mullins's testimony, the remaining evidence at trial overwhelmingly supports Eli's sexual-battery convictions. N.C.'s in-person trial testimony, in which she vividly recounted the sexual conduct Eli made her endure, comprised the crux of the state's case. Her description of the abuse that she suffered easily satisfied the statutory definition of sexual conduct. She also explained that the abuse began around 2007 and continued well into 2009. And Eli's attorney subjected her to rigorous cross-examination.

{¶ 50} Lieutenant Marlow, Detective Salyer, and Borland all offered trial testimony corroborating important details of N.C.'s account. The testimony of the law-enforcement officials demonstrated that N.C. consistently alleged that Eli had sexually abused her, from the time that she first contacted authorities in 2010 through Eli's trial.

{¶ 51} Evidence that Eli claimed that he had engaged in consensual sexual relations with N.C. was provided through the trial testimony of Eli's former friend, Penhorwood. Penhorwood testified that when he confronted Eli about the allegations, Eli responded, "[I]f it was consensual, why am I getting charged with rape?"—a statement that Penhorwood understood as an admission that compelled

17

him to contact law enforcement. In his trial testimony, Eli offered contradictory explanations. He testified that he had never talked to Penhorwood about the allegations. But he also admitted that he had asked Penhorwood, "If [he] had consensual relation[s] * * * with [N.C.], how could they charge [him] with rape?" And while he claimed that Penhorwood had been wrong to take that question as an admission, he offered no explanation for asking his friend a supposedly hypothetical question about the legal standard for a sex crime.

{¶ 52} Like Penhorwood, Mullins also said that Eli had admitted to having had consensual sexual relations with N.C. But given the other evidence at trial—particularly N.C.'s testimony, the corroborating details provided by other witnesses, and Penhorwood's testimony—we conclude that there is no reasonable possibility that Mullins's testimony contributed anything to the jury's findings of guilt that it could not have gleaned from other witnesses. *See Schneble*, 405 U.S. at 431, 92 S.Ct. 1056, 31 L.Ed.2d 340.

{¶ 53} We overrule Eli's proposition of law because the remaining evidence at trial overwhelmingly proved his guilt. The trial court's decision to allow Mullins to testify by video was harmless error.

### III. CONCLUSION

{¶ 54} Applying the United States Supreme Court's decision in *Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666, we conclude that the trial court erred in allowing a witness to testify by video without making sufficient case-specific findings of necessity, in violation of Eli's right to face-to-face confrontation guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution. But in light of the other evidence presented against Eli at trial, this error was harmless. We affirm the judgment of the Third District Court of Appeals, albeit on different grounds than those relied upon by that court.

Judgment affirmed.

KENNEDY, C.J., and DONNELLY and DETERS, JJ., concur.

FISCHER, J., concurs, with an opinion joined by DONNELLY and DETERS, JJ. STEWART and BRUNNER, JJ., concur in judgment only.

———————————

**FISCHER, J., concurring.**

{¶ 55} I fully agree with the majority opinion that the trial court erred by allowing Michael Mullins to testify remotely in the trial of appellant, Eli Carter, and that this error was harmless. Therefore, I concur in the majority opinion.

{¶ 56} I write separately, however, to address this court's precedent interpreting the Confrontation Clause of Article I, Section 10 of the Ohio Constitution. In an appropriate case, we should revisit our conclusions that the Ohio Constitution's Confrontation Clause must be interpreted in lockstep with the Confrontation Clause of the Sixth Amendment to the United States Constitution.

**I. Reviewing the confrontation issue under the Sixth Amendment is appropriate because Carter did not sufficiently raise a confrontation claim under the Ohio Constitution**

{¶ 57} In challenging his convictions, Carter has argued that the trial court violated his due-process rights by permitting Mullins to testify remotely by video using a speech-to-text captioning program. Carter argues more specifically that Mullins's testimony violated his confrontation rights under both the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. He relies primarily on Sixth Amendment caselaw—understandably, because this court has interpreted Article I, Section 10 of the Ohio Constitution to guarantee the same right to confrontation as that guaranteed under the Sixth Amendment. *See State v. Self*, 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (1990) ("Our interpretation of Section 10, Article I has paralleled the United States Supreme Court's interpretation of the Sixth Amendment"); *State v. Madison*, 64 Ohio St.2d 322, 330, 415 N.E.2d 272 (1980) (rejecting the proposition that Article I, Section 10 of the Ohio Constitution is "more demanding of a face-to-face confrontation

than the United States Constitution"). Because Carter has not asked us to revisit this precedent, and because his arguments rely almost exclusively on Sixth Amendment caselaw, the majority opinion appropriately declines to revisit our previous interpretation of the right to confrontation under Article I, Section 10. *See Stolz v. J & B Steel Erectors, Inc.*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, ¶ 44 (Fischer, J., concurring) (noting that it is proper that the court "does not conduct an analysis of unraised arguments").

**{¶ 58}** While Carter's failure to develop a detailed claim under the Confrontation Clause of Article I, Section 10 of the Ohio Constitution precludes our review of that issue, it is hard to lay the blame solely on his shoulders. This court's recalcitrance to interpret Article I, Section 10 in accordance with its plain text and history likely gives litigants the impression that the thorough development of such a claim would be a fool's errand. This court has seen time and again that its precedent and approach interpreting the Ohio Constitution in lockstep with the United States Constitution discourages some litigants from vigorously arguing claims under the Ohio Constitution. *See, e.g.*, *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 25 (Fischer, J., concurring). In the future, parties should not hesitate to raise and vigorously argue claims under the Ohio Constitution, especially if this court has not analyzed the relevant constitutional provision in light of its plain text, history, and tradition. Likewise, this court should not shirk its responsibility as the final arbiter of Ohio law, including the Ohio Constitution.

## II. We should revisit *Self* and *Madison* in an appropriate case

**{¶ 59}** The Ohio Constitution is a "document of independent force." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993); *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 14 (lead opinion). The independent force of state constitutions serves an important function in our federalist system. *See, e.g.*, Brennan, *State Constitutions and the Protection of Individual Rights*, 90

Harv.L.Rev. 489, 491 (1977) (observing that the protections provided by state constitutions often extend "beyond those required by the [United States] Supreme Court's interpretation of federal law"). As long as a given reading of the Ohio Constitution provides "at least as much protection" as the United States Constitution demands, federal precedent does not constrain this court's interpretation of the Ohio Constitution. *Arnold* at 42. The Ohio Constitution may, in certain circumstances, provide greater rights than those afforded by the United States Constitution. *See Mole* at ¶ 20-21.

{¶ 60} Both the United States Constitution and the Ohio Constitution guarantee an Ohio criminal defendant the right to confront the witnesses against him. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." Article I, Section 10 of the Ohio Constitution guarantees a criminal defendant the right "to meet the witnesses face to face."

{¶ 61} Despite significant textual differences between the Confrontation Clause of the Sixth Amendment and the Confrontation Clause of Article I, Section 10, this court has interpreted the two clauses in lockstep. *Self*, 56 Ohio St.3d at 79, 564 N.E.2d 446; *Madison*, 64 Ohio St.2d at 330-331, 415 N.E.2d 272. This court has declined to interpret Article I, Section 10's guarantee of a criminal defendant's right to confront the witnesses against him "face to face" at its "literal extreme," *Self* at 79, citing *Madison* at 332-334 (Brown, J., dissenting). Consequently, in *Self*, this court interpreted Article I, Section 10 in a manner "parallel" to the Sixth Amendment and looked to federal law for an interpretation of both provisions without looking to the text, history, and tradition of Article I, Section 10. *See Self* at 79.

{¶ 62} This sort of upward delegation does a tremendous disservice to the Ohio Constitution. *See Sherman v. Ohio Pub. Emps. Retirement Sys.*, 163 Ohio St.3d 258, 2020-Ohio-4960, 169 N.E.3d 602, ¶ 37 (Fischer, J., concurring in

judgment only). Contrary to what our precedent indicates, "we are not bound to walk in lockstep with the federal courts when it comes to our interpretation of the Ohio Constitution." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 28. The United States Supreme Court has affirmed on numerous occasions the notion that a state's constitution may provide greater constitutional protection than that required by the federal Constitution. *See, e.g.*, *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) (noting that states may "impose higher standards on searches and seizures than required by the Federal Constitution"); *Nichols v. United States*, 511 U.S. 738, 748, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994), fn. 12 ("Of course States may decide, based on their own constitutions or public policy, that counsel should be available for all indigent defendants charged with misdemeanors").

{¶ 63} Indeed, this court's reflexive adoption of the federal courts' interpretation of the Confrontation Clause of the Sixth Amendment to the United States Constitution as the sole interpretation of the Confrontation Clause of Article I, Section 10 of the Ohio Constitution pays too little attention to the significant textual and historical differences between the United States and Ohio Constitutions. *See State v. Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, 168 N.E.3d 1163, ¶ 45 (DeWine, J., dissenting) (stating that this court "has routinely lumped [the speedy-trial provisions of the federal and Ohio Constitutions] together and resolved both using federal standards, without any consideration of the text or history of the state provision"). These differences warrant closer scrutiny.

{¶ 64} The Ohio Constitution is "a fundamental law," Alexander Hamilton, The Federalist No. 78, at 466 (Clinton Rossiter Ed.1961) ("A constitution is, in fact, and must be regarded by the judges as, a fundamental law"). As judges, it is our province to ascertain its meaning. *Id.* Our interpretation of the Ohio Constitution must look to the text, history, and tradition of the provision at issue. *Smith* at ¶ 29; *see State v. Weber*, 163 Ohio St.3d 125, 2020-Ohio-6832, 168 N.E.3d 468, ¶ 122-

123 (Fischer, J., dissenting); *id.* at ¶ 109 (DeWine, J., concurring in judgment only). This court failed to conduct such an analysis in *Self* and *Madison*. As a result, this court failed to recognize that Ohio has "a different confrontation clause, written in a different time with a different backdrop, and invoking different language." *State v. Banks*, 1st Dist. Hamilton Nos. C-200395 and C-200396, 2021-Ohio-4330, ¶ 51 (Bergeron, J., concurring).

{¶ 65} This court previously acknowledged the importance of the unique language contained in Ohio's Confrontation Clause. *See, e.g.*, *Summons v. State*, 5 Ohio St. 325, 341 (1856) ("The requirement that the accused shall be confronted, on his trial, by the witnesses against him, has sole reference to the personal presence of the witnesses"); *Griffin v. State*, 34 Ohio St. 299, 304 (1878) ("There is no doubt that the prisoner had a constitutional right ([Article I, Section 10]) to appear in court at his trial, and defend in person and by counsel, and to meet the witnesses face to face before an impartial jury"); *Madison*, 64 Ohio St.2d at 332-333, 415 N.E.2d 272 (Brown, J., dissenting) (observing that the Confrontation Clause of Article I, Section 10 is "much more detailed than the Confrontation Clause contained within the Sixth Amendment" and "must be read to give a defendant greater rights to confrontation * * * than that given under the federal constitution"). Additionally, other states whose constitutions include "face to face" language in their confrontation clauses have found that their constitutions provide greater confrontation rights than those provided by the Sixth Amendment. *See, e.g.*, *Brady v. State*, 575 N.E.2d 981, 987 (Ind.1991) (holding that although the "face to face" language in the Confrontation Clause of the Indiana Constitution "has much the same meaning and history as that employed in the Sixth Amendment, it has a special concreteness and is more detailed").

{¶ 66} Put simply, words have meaning. When otherwise analogous provisions of the Ohio Constitution and the federal Constitution differ in their text, this court should not mechanically read them as perfectly equivalent. We do the

citizens of Ohio a disservice when we do so, especially when the language used in the provisions differs as greatly as it does in the confrontation provisions here. In an appropriate case, we should revisit our decisions in *Self* and *Madison* and analyze the Confrontation Clause of Article I, Section 10 of the Ohio Constitution in accordance with its plain text, history, and tradition. *See Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, at ¶ 29; *Weber* at ¶ 122-123 (Fischer, J., dissenting); *id.* at ¶ 109 (DeWine, J., concurring in judgment only).

### III. Conclusion

{¶ 67} Because Carter did not develop a confrontation claim under the Ohio Constitution, the majority opinion appropriately limits its analysis of Carter's proposition of law to the Confrontation Clause of the Sixth Amendment to the United States Constitution. I agree with the majority opinion that any Sixth Amendment violation resulting from the trial court's admission of Mullins's testimony constitutes harmless error. Thus, I respectfully concur in the majority opinion.

{¶ 68} I write separately to encourage parties to raise and develop confrontation claims under the Ohio Constitution. In a future case, this court should reexamine the path adopted in *Self* and *Madison* and interpret the Confrontation Clause of Article I, Section 10 of the Ohio Constitution in a manner that considers its textual and historical differences from the Confrontation Clause of the Sixth Amendment to the United States Constitution.

DONNELLY and DETERS, JJ., concur in the foregoing opinion.

_____

Eric C. Stewart, Logan County Prosecuting Attorney, for appellee.

Samuel H. Shamansky Co., L.P.A., Samuel H. Shamansky, and Donald L. Regensburger, for appellant.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van and Kristen Hatcher, Assistant Prosecuting Attorneys, urging affirmance for amicus curiae, Ohio Prosecuting Attorneys Association.

————————————————