[Cite as *State v. Abraham*, 2024-Ohio-5600.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                       :

                                   No. 113782

    v.                                            :

RALIEGH ABRAHAM,                                  :

    Defendant-Appellant.                      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 27, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-674860-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Abe Dakdouk, Assistant Prosecuting Attorney, *for appellee.*

Russel S. Bensing, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Raliegh Abraham ("Abraham") appeals his convictions for two counts of substantial impairment rape as being against the manifest weight of the evidence. For the reasons that follow, we affirm Abraham's convictions.

## I.  Facts and Procedural History

{¶ 2} On November 22, 2021, M.H. and Abraham agreed to meet for drinks after M.H. got off work at midnight.  M.H. and Abraham went to a bar at approximately 1:00 a.m. on November 23, 2021 and M.H. became intoxicated and vomited in the bar's bathroom.  Abraham helped M.H. get into his truck because she was "stumbling" and he drove M.H. back to his house.  M.H. was then "helped" upstairs. The next thing she recalled was waking up in Abraham's bed with his head between her legs.  M.H. passed out and when she woke up again, Abraham was engaging in sexual intercourse with her.  M.H. left Abraham's house and went home.  Later that night, M.H. went to a hospital and reported that she had been raped.

{¶ 3} On October 6, 2022, Abraham was indicted for two counts of forcible rape in violation of R.C. 2907.02(A)(2) and two counts of substantial impairment rape in violation of R.C. 2907.02(A)(1)(c).  Abraham waived his right to trial by jury and his case proceeded to a bench trial in January 2024.  On January 31, 2024, the court acquitted Abraham of both counts of forcible rape and found him guilty of both counts of substantial impairment rape.  On March 4, 2024, the court sentenced Abraham to three-to-four-and-a-half years in prison on each count to run concurrently and determined him to be a Tier III sex offender.

{¶ 4} Abraham appeals and assigns one error for our review.

> The trial court erred by entering a conviction which was against the manifest weight of the evidence.

## II. Trial Testimony and Evidence

### a. M.H.

{¶ 5} M.H. testified that she has two jobs and works about 40 hours per week. M.H. knows Abraham, who she referred to as "Cousin Bic," because her great-aunt dated his father. According to M.H., prior to this incident, she had not seen Abraham since her great-aunt and his father broke up "at least ten years ago." M.H. testified that, at the time of trial, she had not spoken to or seen Abraham "for many years." According to M.H., she and Abraham "weren't super close or anything like that."

{¶ 6} On November 22, 2021, M.H. went to work and while at work received a Facebook message from Abraham. At the time, she was not "friends" with Abraham on Facebook. At first, M.H. did not recognize from whom this message emanated. M.H. testified that the message "was asking me about, if I was at a bar the night prior." M.H. responded that she was not. According to M.H., Abraham "started saying, you know, how I looked familiar to him. And when I really looked at his picture, I thought the same, and then from there we talked some more and realized who each other were." Eventually, "something was brought up about getting together for a drink." M.H. testified that the "agreement was that I would drive from my house to his house; and from his house, him and I would go to the bar together."

{¶ 7} When M.H. got off work that night, she went home, changed outfits, let her mom know where she was going and with whom and left. M.H. testified she did

not shower or "do any sort of female grooming" before leaving. Asked if she was "anticipating anything happening between" herself and Abraham that night, M.H. answered, "No, I was not." According to M.H., the purpose of meeting Abraham was "[c]atching up and having a drink together."

{¶ 8} M.H. testified that she arrived at Abraham's house between "midnight and 12:30." M.H. and Abraham "just talked for a few minutes before we got into his truck and headed to the bar." M.H. testified that she has had genital herpes for 11 years and she "had a genital herpes breakout" at this time. M.H. agreed that this condition prohibited her "from being sexually active at that point in time."

{¶ 9} M.H. testified that she and Abraham went to a bar she had never been to before located in either Biddulph Plaza or Brook Park Plaza. The two "sat there drinking and talking." M.H. had a "cherry bomb," which is "cherry vodka with Red Bull." M.H. ordered it "as a drink and a shot." M.H. recalled that she drank "two drinks and two shots" that night and that "[a]ll of it was a cherry bomb." M.H. testified that, from what she could remember, she and Abraham "danced at one point." M.H. further testified that, before they left, she went to the restroom because she "needed to throw up . . . close to bar closing time." Asked if she knew why she threw up, M.H. answered, "No, I don't." According to M.H., Abraham and a couple they had been talking to in the bar came into the bathroom to tell her that the bar was closing. M.H. testified that she saw Abraham "standing outside of the bathroom door" when she was "trying to wash [her] hands and rinse [her] mouth."

{¶ 10} Asked what happened when she left the bathroom, M.H. testified as follows: "When I left the bathroom, I recall stumbling and [Abraham] had to hold me up." According to M.H., Abraham asked her where she wanted to go and she told him she wanted to go home. When they got into Abraham's truck, he again asked M.H. where she wanted to go and she again told him she wanted to go home. Abraham drove M.H. to his house. M.H. further testified that, on the way to Abraham's house, she fell asleep in the truck.

{¶ 11} M.H. testified that, when they arrived at Abraham's house, she "stumbled out of the truck" and Abraham "helped escort" her into his house. Asked to describe her "mental state of mind," M.H. responded, "At that point in time, it was just not very good . . . . I was extremely intoxicated." Asked how she knew she was intoxicated, M.H. said, "I was stumbling. I wasn't — I was fairly weak. It was hard for me to stand and walk on my own." M.H. further testified that she did not want to be at Abraham's house. M.H. testified: "After we got inside of his house, I remember walking through the living room up to the stairs . . . . From the stairs, after the stairs, the only other thing I remember is waking up on his bed . . . . When I woke up and I was laying on his bed, I can remember feeling and seeing his head in between my legs [b]y my genitals . . . My vagina." Asked what Abraham was doing, M.H. answered, "[H]e was using his tongue to lick my vagina."

{¶ 12} M.H. testified that she did not consent to this nor did she want this. Asked if she tried to get Abraham to stop, M.H. replied, "Yes, I did . . . . I attempted to push his head off of me." According to M.H., Abraham responded by pushing her

hand away.  M.H. testified that she then passed out and when she woke up again Abraham was on top of her.  Asked what Abraham was doing, M.H. testified, "He had his penis inside of my vagina."  M.H. testified that she did not consent to this nor did she want this.  Asked if she did anything to get Abraham to stop, M.H. replied, "I said no.  I said stop."  Asked if he stopped, M.H. answered, "No . . . . He kept going."

{¶ 13} According to M.H., Abraham eventually stopped.  "He pulled off of me and looked at my face and he said, What's wrong?"  M.H. told Abraham to "Get off."  Abraham did and M.H. "got up, pulled my underwear and pants up, grabbed my purse and left."  According to Abraham, her sweater, tank top and boots had not been removed but that her pants and underpants were pulled down.  M.H. got in her car and "attempted to drive home" but she went the wrong way.  When M.H. eventually arrived home she noticed that Abraham had sent her a message on Facebook "asking me what was wrong."  Specifically, M.H. testified that Abraham sent her the following message:  "If you could please tell me what I did wrong I'm really sorry[.]  If you want me to leave you alone I totally understand.  I just want to know what I did wrong[.]"  According to M.H., the "timestamp" on Abraham's message was "November 23rd at 4:10 a.m."  M.H. testified that she responded to Abraham by messaging, "I said no[.]  Many times[.]"  M.H. further testified about the remainder of the message exchange between her and Abraham:

Abraham:          Send note to what I don't understand

                        I'm so so sorry

M.H.: Sex

Please leave me alone never contact me again

Abraham: You were the one who wanted to LOL I mean we both did but you did too I'm very sorry

M.H.: I said no

Abraham: Please can we talk about th[indecipherable]ovie Friends

M.H.: I said take me home

Abraham: Talk about this and be friends

Girl I would have took you home I asked you

M.H.: I said no take me home

Abraham: It's not what you sai

Ssid

M.H.: I didn't want that at all

Yes it is I said take me home

I said take me home I didn't want that at all

Abraham: Said okay I'm sorry that's not what you said though okay would I'm sorry

M.H.: Not one bit did I want that

Abraham: That's not what you said at the bar but I am very sorry I feel

M.H.: I f––g said take me home and.  O the whole f——g time

What part of that said I wanted it????

Even at the bar I said take me home

Abraham:        That's not what you said those people at the bar that heardit to

M.H.:           I've been trying to go home

Abraham:        No that's not what you said at the bar I'm sorry [indecipherable] you too many shots.

                I'm sorry it doesn't have to happen again can we please be friends

M.H.:           I said to take me home I even told the lady I wanted to go home

                No

                Leave me alone

Abraham:        Okay well nobody at the bar remembers hearing that

M.H.:           Leave me the f——k alone

Abraham:        Okay I'll leave you alone I feel terrible though I'm so sorry

M.H.:           Go to h——l

{¶ 14} According to M.H., Abraham responded to her last message with a "thumb's up" emoji. M.H. further testified about one last message she received from Abraham on November 23 at 10:40 a.m., which read, "Hey if you never want me to message you again I won't but I really wish we could talk about last night I'm very sorry and I really would like you not to hate me[.]"

{¶ 15} Later that morning M.H. "blocked" Abraham on Facebook. M.H. testified that she showered and went to work. According to M.H., she "felt very upset and just a complete mess." M.H. further testified that she was "very groggy." M.H. talked to her mom that morning but she did not tell her mom what had happened

because she was "[s]cared, embarrassed. He knows my family, so I just, I just didn't say anything."

{¶ 16} Asked if she was able to work that day, M.H. replied, "No, no, I was not." M.H. testified that "[a]round 8, 9:00" p.m. she went to the emergency room "for sexual assault." M.H. met with a sexual assault nurse examiner ("SANE nurse") who conducted a sexual assault examination. According to M.H., she had "injuries" on her inner thighs. M.H. testified that these "bruises" were not there "before [she] met [Abraham] that evening."

{¶ 17} Asked if she remembered the sexual assault examination and how it felt, M.H. answered as follows:

> Horrible. While I was there, I had to tell her everything that happened. She had to — I had to strip naked and put a gown on. She had to examine my vagina, my thighs, the rest of my body. She drew blood, she took urine. She scraped underneath my nails. We sat there, we talked, she asked me what happened and everything. I explained to her what happened.

{¶ 18} M.H. testified she told the SANE nurse that she did not want to give a statement to the police at the time. M.H. further testified that "I wanted to speak with my mom before I proceeded." According to M.H., she "eventually met with an officer or detective . . . about a week" after the sexual assault occurred. M.H. clarified that she met with detective Sabrina Choat. M.H. further testified that when she left Abraham's house at approximately 3:00 or 4:00 a.m. on November 23, 2021, she went the wrong way to get home because she was still intoxicated.

{¶ 19} On cross-examination, M.H. testified that, at the time this incident occurred, she and Abraham lived about five minutes away from each other. On the day of the incident, M.H. worked in Brunswick, which is about 25-30 minutes from where she lived, from 4:00 p.m. to midnight. M.H. testified that during her shift, she and Abraham began to communicate via Facebook.

{¶ 20} Abraham's defense counsel asked M.H. a series of questions regarding what she did at the end of her eight-hour shift on the night in question. M.H. testified that she went home from Brunswick, changed into dark blue jeans, boots, a yellow tank top and a sweater and then drove to Abraham's house. According to M.H., Abraham told her that his roommate was also in the house but M.H. never saw anybody other than Abraham.

{¶ 21} On cross-examination, M.H. testified that she still could not remember the name of the bar she and Abraham went to that night. There were not a lot of people there and M.H. and Abraham engaged in conversation with another couple at the bar. M.H. agreed that she had "a cherry bomb or two" that night. M.H. testified that Abraham was also drinking alcohol that night, although M.H. could not remember what specifically Abraham was drinking.

{¶ 22} M.H. testified that "it was five, ten minutes" from Abraham's house to the bar and they arrived at "12:30-ish." M.H. agreed with defense counsel that it was "probably closer to the 1:00 hour that you got to that bar, 1 or 1:15." While they were at the bar, she and Abraham went outside to the back patio "to have some cigarettes" and, at one point, they danced. M.H. further agreed with defense counsel

that she and Abraham were at the bar for "an hour or so" that night and M.H. "consumed" one or two cherry bombs, as well as got sick, during this time. After getting sick in the bathroom, M.H. was "falling down" and "stumbling" and Abraham assisted her to his truck.

{¶ 23} According to M.H., she did not try to leave in her car or call for a ride home when they arrived at Abraham's house. Furthermore, although she knew that Abraham's roommate was home, she did not "cry out for help . . . ." M.H. testified that she was "extremely intoxicated" that night. Asked to describe this, M.H. said, "Dizziness, . . . hard to control your own movements, and things like that." M.H. testified that she was "blacking in and out." Defense counsel asked if M.H. "had a blackout that night" and defined blackout as "when you pass out and you have no recollection of what happened." M.H. answered, "I would have to say no."

{¶ 24} M.H. testified on cross-examination about what happened when she and Abraham arrived back at his house after leaving the bar. Defense counsel asked M.H. if she went to her car, which was parked in the street. M.H. replied, "Honestly, I don't know what I was doing." According to M.H., Abraham helped her into his house. Asked, "[D]id you say that you wanted to go home at that point in time," M.H. answered, "No." M.H. testified that she went upstairs to the second floor and she "assumed" that she went into the bedroom.

{¶ 25} M.H. testified that she woke up in Abraham's bed with her jeans and "foundation garments" pulled down to her knees and Abraham's head in between her thighs. According to M.H., Abraham was performing cunnilingus on her. M.H.

testified that she "attempted to push his head off of me" and then she "passed out again." M.H. testified as follows about what happened next:

> Q: And then you said that you woke up and he was on top of you and he had inserted his penis within your vaginal cavity?
>
> A: Yes.
>
> Q: And did you cry out at that point in time for the other person who was in the house to help you?
>
> A: No. I told [Abraham] no, I told him to stop.
>
> Q: And when you said . . . no, he stopped and pulled out?
>
> A: No, he did not.

{¶ 26} According to M.H., she eventually pulled her clothes up and left Abraham's house. She drove to her house but got lost along the way. M.H. and Abraham engaged in a text message exchange at approximately 4:30 a.m. The gist of the messages was Abraham asking what he did and M.H. telling him to leave her alone. M.H. testified that when she got home, she went to bed. M.H. testified that when she woke up, she talked to her mom although she did not tell her mom what happened. Asked if she had "a cup of coffee and . . . some breakfast," M.H. replied, "I didn't eat."

{¶ 27} M.H. testified that she took a shower and went to work in Twinsburg. According to M.H., she arrived at work at "about 3 or 4" but did not work her entire shift. M.H. left at "about 7," went to the "Brunswick facility" and told "them" that she had been sexually assaulted. M.H. explained what happened to the SANE nurse. Approximately one week later, M.H. reported what happened to the police.

{¶ 28} M.H. attempted to clarify whether she "blacked out" that night. M.H. testified that she was "passing out" and when asked if she was losing consciousness at certain points," M.H. answered, "Yes." Asked if she said to Abraham "at any point in the night that [she] wanted to have sex with him" or wanted him to perform oral sex on her, M.H. replied, "No." Asked if she and Abraham had "any discussion throughout the night about sex," M.H. answered, "No."

{¶ 29} During M.H.'s redirect examination, the following colloquy occurred:

Q: And when he was performing cunnilingus on you, did you say no to him?

A: Yes.

Q: And you said you tried to push his head away as well?

A: Yes.

Q: And you blacked out?

A: Yes.

Q: When you came to, he was on top of you and with his penis inside of your vaginal cavity?

A: Yes.

Q: Did you say anything to him at that point?

A: I said stop.

Q: Did you say no?

A: Yes.

Q: And you had bruises and injuries to your inner thighs after this incident?

A: Yes.

Q:     And not before?

A:     Yes.

### b. Kayla Galton

{¶ 30} Kayla Galton ("Galton") testified remotely via Zoom that she is a nurse in the trauma ICU of the University of Washington's Harborview Medical Center in Seattle, Washington but was employed as a surgical ICU and SANE nurse at the Cleveland Clinic.  Galton testified that she has performed 36 sexual assault examinations as a SANE nurse and has been qualified in court as an expert in the field.  In this case, the court qualified Galton as an expert witness.

{¶ 31} Galton testified that she was employed by the Cleveland Clinic as a SANE nurse in 2021.  On November 23, 2021, Galton performed a sexual assault examination on M.H.  The State introduced M.H.'s medical records from the examination into evidence and Galton testified that part of these records included her documented report from M.H.'s examination.  This report included M.H.'s "narrative" to Galton explaining "the events which occurred on 11/23/21 . . . ."  Galton did not testify about this narrative because the court sustained defense counsel's objection regarding this line of questioning. The document, however, was admitted into evidence.

{¶ 32} Galton testified that M.H. arrived at the emergency room at 8:09 p.m. and related to Galton that the sexual assault occurred at 2:30 a.m. at the "assailant's house," which is located a few blocks from M.H.'s house.  Galton testified that M.H. told her "she was penetrated vaginally with assailant's penis and mouth . . . ."  Galton

testified that M.H. has genital herpes and she was having an outbreak at the time of the assault. According to Galton, M.H. disclosed that she had been sexually assaulted and "[h]e had, like, held her down on the bed while assaulting her." Galton took DNA swabs from M.H.'s body and collected blood and urine samples "for the drug-facilitated sexual assault kit [that] was sent to the crime lab to be processed there."

{¶ 33} Asked if M.H. had any injuries, Galton testified as follows: "Yes. I noted a small abrasion on her left cheek. I noted an abrasion on her right upper arm, and then I noted mild bruising to her bilateral upper thighs, and a cluster of abrasions to her left thigh." Asked if these injuries to M.H. were "consistent with someone that has been a victim of a sexual assault," Galton replied as follows: "Yeah. While the injuries — while injury with sexual assault doesn't always occur, it certainly is used as a piece of the puzzle when explaining the way that the patient, the victim, was held or handled during the assault."

{¶ 34} On cross-examination, Galton established that her examination of M.H. took place "approximately 18-some-odd hours after the alleged incident occurred . . . ." Galton testified that, as part of the examination, she collected M.H.'s underwear, which was the same underwear that M.H. wore at the time of the assault. Defense counsel asked Galton if M.H. "was under the influence of any intoxicants" when she presented herself to Galton at the "emergency department." Galton answered, "No." Galton testified that, despite M.H. stating that she had "an outbreak of . . . genital herpes," Galton "did not document any visible lesions at the

time of the assessment." Galton further testified, however, that "genital herpes isn't always expressed outwardly on the genitals that you can see from the outside of the body."

### c. Salesha Frantz

{¶ 35} Salesha Frantz ("Frantz") testified that she is a forensic DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory. The court in this case qualified Frantz as an expert witness in the field of DNA analysis. Frantz testified that she generated a report on March 8, 2022, from the "sexual assault evidence collection kit" in M.H.'s case. Frantz further testified that there was a match between Abraham's DNA and DNA found in "the dried stain from the bilateral inner thighs" of M.H.

### d. Sabrina Choat

{¶ 36} Sabrina Choat ("Choat") testified that she is a Cleveland police detective assigned to the Sex Crimes/Child Abuse Unit. Choat testified that in November 2021, she was "assigned a property found report." Choat further testified that "a property found [report] is when there is a victim that goes to the hospital and they have a sexual assault kit completed, but yet don't want to confer with officers or law enforcement at that time." Choat related that M.H. came to the police department and reported the assault. Choat interviewed M.H., who identified Abraham as the "suspect in this matter." Choat also "spoke with [Abraham] a couple times on the phone."

{¶ 37} According to Choat, during her interview, M.H. was "upset, she was — there was some frustration because she did not have much memory. We were trying to put things together." Choat testified that M.H. was not able to identify "a location" because M.H. "had no memory. She had bits and pieces." According to Choat, M.H. "remembered there was a smaller bar and she remembered there was a patio that they went and smoked on." M.H. further recalled that "it was in a plaza." Choat investigated "bars that [she] was able to locate" but was not able to obtain any pertinent information.

{¶ 38} Choat testified that she obtained a search warrant, collected Abraham's DNA and requested a comparison with the DNA found in M.H.'s sexual assault kit. Choat further testified that there was a match between Abraham's DNA and "what was obtained in the sexual assault kit." Additionally, Choat "got text messages from [M.H.] and . . . had . . . Abraham's phone dumped." Choat testified that she reviewed this evidence and presented it to a prosecutor.

{¶ 39} On cross-examination, Choat testified about M.H.'s toxicology report, which was generated by the Cuyahoga County Regional Forensic Science Laboratory on February 8, 2022, using blood and urine samples taken from M.H. on November 24, 2021. Defense counsel asked Choat if she reviewed "those documents to see if somebody had been given a roofie or something of that nature that they were impaired . . . ." Choat replied, "Yeah, that's what we're looking for." This line of questioning continued:

Q: But there was nothing in [M.H.'s] system that would be indicative of any type of impairment 18 hours after it occurred?

A: Not after 18 hours.

## III. Law and Analysis

### a. Zoom Witness

{¶ 40} Preliminarily, we sua sponte address the issue of whether Galton's remote testimony violated Abraham's United States Constitutional right pursuant to the Sixth Amendment "to be confronted with the witnesses against him," which is often referred to as the Confrontation Clause. In this case, the State filed a motion to allow remote witness testimony related to Galton's testifying "via teleconference using the computer program Zoom." The defendant did not oppose this motion and the court did not rule on this motion. Rather, the prosecutor called Galton "to the stand" and announced that "she will be appearing via Zoom."

{¶ 41} The United States Supreme Court has held that the Confrontation "Clause's ultimate goal is to ensure reliability of evidence . . . . It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). *See also* Ohio Const., Art. I, § 10; *State v. Self*, 56 Ohio St.3d 73, 78 (1990) ("Our interpretation of Section 10, Article I [of the Ohio Constitution] has paralleled the United States Supreme Court's interpretation of the Sixth Amendment . . . ."). The Ohio Supreme Court has stated that the Sixth Amendment "encompasses the rights to have a witness physically appear in the courtroom, to require the witness

to testify under oath, and to force the witness to be subject to cross-examination." *State v. Carter*, 2024-Ohio-1247, ¶ 27.

{¶ 42} In *Maryland v. Craig*, 497 U.S. 836, 844 (1990), the United States Supreme Court held that the Confrontation Clause does not guarantee "criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." (Emphasis omitted.) Rather, "the Confrontation Clause reflects a preference for face-to-face confrontation at trial . . . ." *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). This line of case law has developed to require courts to use an "interest-balancing framework" to make a "'case-specific finding' . . . that an exception to face-to-face confrontation" is necessary. *Carter* at ¶ 36. The court's finding must be "based on evidence presented by the parties" that the exception is "'necessary to further an important state intertest' or 'public policy' objective." *Carter* at ¶ 35, quoting *Craig* at 852.

{¶ 43} In *Carter*, the Ohio Supreme Court addressed the issue of whether the defendant's "right to face-to-face confrontation was violated because the trial court allowed a witness to testify remotely by way of video conference." *Id.* at ¶ 1. The *Carter* Court found that "the trial court erred by allowing the remote testimony. Under United States Supreme Court precedent, a trial judge may only dispense with the requirement of face-to-face confrontation in narrow circumstances. But the trial court in this case did not make sufficient findings to establish that such circumstances existed." *Id.* at ¶ 2. The *Carter* Court further found that "the use of videoconferencing was harmless error" because, given "the other evidence

presented at trial, there was no reasonable possibility that the trial court's error in allowing the remote testimony contributed to [the defendant's] conviction." *Id.* at ¶ 3.

{¶ 44} In *Carter*, the defendant was accused of sexual offenses against his adopted daughter. *Id.* at ¶ 4. At the defendant's jury trial, his former employer testified against him by video. *Id.* at ¶ 12. The State filed a motion to allow this video testimony and the defendant objected. *Id.* at ¶ 13. This witness lived in Minnesota at the time of Carter's trial, and the trial court found the COVID-19 pandemic, the uncertainty of "travel by air" and the unpredictability of the weather "rendered" the witness "'unavailable to testify in person' and that the video format would not hinder the defense's ability to cross-examine him." *Id.* at ¶ 13.

{¶ 45} The jury found Carter guilty of two counts of sexual battery but acquitted him of the remaining sexual offenses charged in the indictment. Carter appealed and the Third District Court of Appeals affirmed finding that "the combination of the pandemic and resultant airline-labor shortages were sufficient bases to justify the trial court's determination . . . ." *State v. Carter*, 2022-Ohio-4559, ¶ 18 (3d Dist.).

{¶ 46} The Ohio Supreme Court agreed with the defendant that "these findings at most recite potential weather-related inconveniences that could have hindered travel but did not necessarily prevent [the witness] from testifying in person." *State v. Carter*, 2024-Ohio-1247, ¶ 37. The Ohio Supreme Court further reasoned that the "trial court heard no evidence about winter weather patterns,

delayed fights, aviation reports (concerning Ohio or Minnesota), road conditions, or airline-staffing shortages." *Id*. Additionally, the trial court's reasoning behind allowing the remote testimony "was not a '*case-specific* finding of necessity' . . . because erratic weather patterns and the delays they cause are equally relevant to *any* trial involving nonlocal witnesses." *Id*. (Emphasis in original.) The *Carter* Court additionally found that "the record does not establish that allowing [the witness] to testify remotely advanced an important state interest." *Id*. at ¶ 38.

{¶ 47} In applying this Confrontation Clause law to Abraham's case, we find that no evidence was presented, and the trial court made no "case-specific finding," to show why it was "necessary" for Galton to testify remotely. Therefore, the trial court erred by allowing Galton to testify remotely. Although we find the court erred, the defense did not object and we find that this error is harmless in this case.

{¶ 48} The harmless-error doctrine is governed by Crim.R. 52(A), which states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In this case, Galton did not testify as to whether M.H. was substantial impairment on the night in question. Indeed, Galton testified that she examined M.H. for sexual assault approximately 18 hours after the alleged incident took place and that M.H. was not "under the influence of any intoxicants" at the time of the examination. However, as will be shown in this opinion, the State presented evidence other than Galton's testimony to show that M.H. was substantial impairment at the time of the sexual assault.

### b. Substantial Impairment Rape

{¶ 49} Pursuant to R.C. 2907.02(A)(1)(c), "No person shall engage in sexual conduct with another when . . . [t]he other person's ability to resist or consent is substantial impairment because of a mental or physical condition . . . and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantial impairment because of a mental or physical condition . . . ."

{¶ 50} The term "substantially impaired" is not defined in the Ohio Revised Code. The Ohio Supreme Court has held that the term "must be given the meaning generally understood in common usage." *State v. Zeh*, 31 Ohio St.3d 99, 103 (1987). Specifically, the Court held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Id*. at 103-104.

{¶ 51} This court has held that "voluntary intoxication is a mental or physical condition that could cause substantial impairment." *State v. Virostek*, 2022-Ohio-1397 (8th Dist.). *See also State v. Jones*, 2015-Ohio-1818 (8th Dist.); *State v. Doss*, 2008-Ohio-449 (8th Dist.); *State v. Martin*, 2000 Ohio App. LEXIS 3649 (12th Dist.) ("[U]nder the plain meaning of the words used in R.C. 2907.02(A)(1)(c), a person whose ability to resist is substantially impaired because of intoxication is a person whose ability to consent or resist is substantially impaired by reason [of] a mental or physical condition.").

### c. Manifest Weight of the Evidence

{¶ 52} A manifest weight of the evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d 380, at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

### d. Analysis

{¶ 53} In Abraham's sole assignment of error, he argues that his convictions for two counts of substantial impairment rape are against the manifest weight of the evidence because "the evidence showed that [he] was unaware that [M.H.] was

substantially impaired." Our reading of Abraham's appellate brief reveals that he is not challenging whether M.H. was substantial impairment. To support this reading, we note that Abraham states the following in his brief: "Brushing aside the question of whether M.H. was truly impaired, it is evident from the Facebook messages the two exchanged after the incident that Abraham was not aware of the impairment." Therefore, we limit the remainder of this analysis to whether Abraham knew that M.H. was substantial impairment.

{¶ 54} This court has held as follows regarding substantial impairment rape:

> [W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether a defendant knew, or should have known, that someone was impaired rather than merely intoxicated.

*Doss* at ¶ 18. Furthermore, in *State v. Foster*, 2020-Ohio-1379, ¶ 48 (8th Dist.), this court held that "[e]vidence that should have alerted an offender to whether a victim was substantially impaired may include evidence that the victim was stumbling, falling, slurring speech, passing out or vomiting."

{¶ 55} In this case the evidence in the record showing that Abraham knew or had reasonable cause to believe that M.H. was intoxicated to the point of being substantial impairment came from M.H.'s testimony. M.H. testified that she and Abraham were together when she was drinking alcohol on the night in question. She further testified that Abraham was standing at the bathroom door when she was inside vomiting. M.H. was stumbling when she exited the bathroom and Abraham

had to hold her up. M.H. fell asleep in Abraham's truck when Abraham was driving back to his house. When they arrived at his house, M.H. was again stumbling and Abraham "helped escort" her into his house. M.H. further testified that she was "extremely intoxicated" and that it was hard for her to stand or walk on her own.

{¶ 56} In addition to testifying that she was visibly intoxicated, M.H. also testified that she was asleep or passed out and she woke up at one point to find Abraham performing oral sex on her and woke up a second time to find Abraham having sexual intercourse with her. This court has held that "sleep is a mental or physical condition that 'substantially impairs' a victim as envisioned by R.C. 2907.02(A)(1)(c)." *State v. Hartman*, 2018-Ohio-2641, ¶ 12 (8th Dist.). *See also State v. Scruggs*, 2019-Ohio-3043, ¶ 22-23 (8th Dist.) (finding that the victim was "substantially impaired by sleep" when "she was twice awakened when [the defendant] had inserted his penis into her vagina"). This court has additionally affirmed a substantial impairment rape conviction as being supported by the weight of the evidence when the victim testified that, "while she was inside [the defendant's] apartment, she 'passed out' more than once" and she "required help to put on her shoes and coat and needed [the defendant's] assistance to walk." *State v. Jones*, 2012-Ohio-5737, ¶ 32 (8th Dist.).

{¶ 57} The only evidence in the record that supports the notion that Abraham may not have known that M.H. was substantially impaired is the Facebook messages he sent to M.H. within an hour or so after the sexual assault occurred asking her to tell him what he did wrong. In these messages, Abraham refers to M.H. having "too

many shots" but he makes no reference to her being asleep or passed out and waking up to find him sexually assaulting her.

{¶ 58} After examining the entire record and weighing all the evidence presented, we cannot say that this is the exceptional case where the factfinder lost its way in convicting Abraham of two counts of substantial impairment rape. In other words, his convictions are supported by the manifest weight of the evidence in the record.

{¶ 59} Accordingly, Abraham's sole assignment of error is overruled.

{¶ 60} Judgment affirmed.

The court finds there were reasonable grounds for this appeal.

It is ordered that the appellee recover from the appellant the costs herein taxed.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
ANITA LASTER MAYS, J., CONCUR