[Cite as *State v. Boyd*, 2015-Ohio-5116.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-961 |
| | | (C.P.C. No. 13CR-4830) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Alex Boyd, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 10, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

*Timothy Young*, Ohio Public Defender, and *Valerie Kunze*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Alex Boyd, appeals from a judgment of the Franklin County Court of Common Pleas, rendered on October 24, 2014, sentencing Boyd to a total of 14 years in prison following a jury verdict finding him guilty of aggravated burglary, rape, kidnapping, and abduction, each with gun specifications. Boyd now appeals arguing that the trial court's instructions were plainly erroneous in that they failed to appropriately instruct the jury on the unanimity requirement. Finding no merit in Boyd's arguments, we affirm the judgment of the trial court.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On September 12, 2013, a Franklin County Grand Jury returned an indictment charging Boyd with aggravated burglary, rape, kidnapping, and abduction, each with firearm specifications. Shortly thereafter, on September 16, 2013, Boyd pled

not guilty.  On April 14, 2014, in a separate action, case No. 14CR-1947, Boyd was charged with possessing a weapon while under disability because of a prior felony offense.  Boyd waived a jury in case No. 14CR-1947 on September 22, 2014. Shortly after the start of the jury trial in this case, the trial court joined this case and case No. 14CR-1947 for the purposes of trial.

{¶ 3}    After holding voir dire on September 22, and the morning of September 23, 2014, the trial court commenced a jury trial on the aggravated burglary, rape, kidnapping, and abduction charges on the afternoon of September 23, 2014.  The first two fact witnesses of relevance to our decision were David Garner and Jeremy Landis, both of whom are Columbus Division of Police patrol officers.  The two officers testified that they were dispatched to an apartment on Roche Drive on September 3, 2013.  Once on the scene, Officer Garner spoke with Boyd (who arrived just seconds after the police did), while Officer Landis spoke with the victim, S.W.  Officer Garner reported that Boyd said he and S.W. had argued, but their encounter had not resulted in a physical altercation, that S.W. had no marks on her, and that he had taken a walk around the block to blow off steam.  Officer Landis was prevented by Ohio Rules of Evidence disallowing hearsay from testifying about what S.W. told him, but he testified that he saw signs of forced entry.

{¶ 4}    Detective James Ashenhurst, lead detective on the case, also testified.  He also explained that he found signs of forced entry and identified photographs showing a dented and warped door to S.W.'s patio.  He recounted how he recovered a Glock 22-handgun stashed beneath some stairs near S.W.'s apartment and expressed the opinion that, owing to a lack of cobwebs and dirt on the weapon, it had not been there long.  The Glock 22 was equipped only with a trigger safety to prevent accidental discharge by means other than a trigger pull.  However, a trigger pull of only five and one-half pounds would both disengage the safety and fire the weapon.  When it was recovered the gun had a live round in the firing chamber.  Detective Ashenhurst additionally testified that he looked for and failed to find evidence that Boyd was a resident of a Roche Drive apartment, but he admitted that the apartment as a whole was relatively bare.

{¶ 5}    The next relevant witness to our review was the victim, S.W.  She testified that she and Boyd had been boyfriend and girlfriend at one time, but that on July 4, 2013 she moved without Boyd from Toledo to Columbus.  After staying with her aunt until

approximately the end of July, she moved into an apartment on Roche Drive. Boyd did not live with her and did not have a key to the apartment on Roche Drive, but she sometimes let Boyd visit her, even allowing him to stay overnight. When Boyd stayed the night, he would sometimes bring various items with him and would also sometimes leave those things behind. When the police arrived after the incident, for instance, S.W. testified that Boyd had shoes at her apartment, some bottles of cologne, a few items of clothing, a GPS, an amplifier, and some jewelry.

{¶ 6} S.W. testified that the prelude to the incident began with a trip to the grocery store on August 31, 2013. She and Boyd went to the store and stayed until shortly after midnight because, on September 1, S.W.'s food stamp card would become active and groceries could be purchased. S.W. then returned to Roche Drive. Boyd did not come with her. On the evening of September 1, 2013, at around 5:30 p.m., Boyd telephoned S.W. and informed her that he had bought her something at the mall. S.W. joined Boyd at Kay Jewelers in the mall and took possession of a necklace Boyd had bought her, and they left the matching ring to be resized. S.W. returned to Roche Drive without Boyd.

{¶ 7} Some interval of time passed after returning from the mall, but while it was still daylight, S.W. looked up from cooking to discover that Boyd had somehow managed to climb onto her elevated back porch and was asking to be let in so they could talk. Initially, she testified that she found it funny that he had somehow managed to climb up onto her porch and that she felt secure in the knowledge that he could not get in since she was in the habit of wedging her door shut with a heavy chair. So she went upstairs and changed clothes. When she came back down to finish cooking, Boyd kicked in the door.

{¶ 8} S.W. testified that Boyd fought her inside the apartment, slapped her, choked her to the point of unconsciousness several times, and dragged her upstairs by her hair. Upstairs they fought more. At one point, Boyd pulled out a gun and threatened her with it. After a time, Boyd gave the gun to her and told her to kill him if she wanted to leave; but, S.W. found that she could not bring herself to shoot him. After that, Boyd took the gun back and began stripping off S.W.'s clothes while S.W. attempted to push him off with her legs. When Boyd began to undress himself, S.W. grabbed his genitals hard in an attempt to control him but eventually let go. Whereupon, Boyd again choked her to unconsciousness, put her on the bed, and, when she regained consciousness, removed the

remainder of her clothing. Boyd then stuck the muzzle of the gun in her vagina. After a time he pulled the gun out, licked it, and began to rape S.W. with his penis. These events took place over what was, to S.W.'s perception, an unknown interval of time during which Boyd would not permit S.W. to leave the room and kept the gun with him, even while sleeping. However, at some juncture S.W. was able to telephone the police.

{¶ 9} The final two witnesses were experts. Monica Robinson was a nurse at Riverside Hospital who saw S.W. on September 4, 2013 following the assault and rape. She testified that she noted no injuries on S.W. either internal or external, but that this was not inconsistent with being slapped, choked, and vaginally penetrated a few days prior. Robinson did note a white fluid in S.W.'s vagina which could either have been S.W.'s own fluid or the remnants of another person's fluid.

{¶ 10} Raymond Peoples, a DNA analyst for the Ohio Bureau of Criminal Investigation, also testified. The parties stipulated that DNA from both the hand grip and the barrel of the gun belonged to both Boyd and S.W., and that Boyd's sperm was found in S.W.'s vagina. Peoples then testified that sperm's half-life means that Boyd's sperm was collected from S.W.'s vagina within 72 hours of sex. He also confirmed that S.W. and Boyd were equal contributors to DNA on the gun and that the findings are consistent with the gun coming in contact with S.W.'s vaginal secretions and with Boyd licking it.

{¶ 11} Following deliberations, on September 30, 2014, the jury convicted Boyd on all counts and also found each specification. Based on the evidence at trial and the stipulation of the parties to the underlying disqualifying offenses, the trial court found Boyd guilty of possessing a weapon while under disability. Thereafter, on October 22, 2014, the trial court held a sentencing hearing. The trial court merged the abduction and kidnapping offenses and ordered Boyd to serve four years on each of the counts, aggravated burglary, rape, and kidnapping, as well as three years on each of the gun specifications. It sentenced Boyd to concurrent terms of imprisonment for rape and kidnapping (including associated specifications) but ordered Boyd to serve those sentences consecutively with the sentence imposed for aggravated burglary and the gun specification for that sentence. Thereby the trial court imposed a total term of imprisonment of 14 years in case No. 13CR-4830. It permitted Boyd to serve that sentence

concurrently with the one year that was imposed on the weapon under disability offense in case No. 14CR-1947.

## II.  ASSIGNMENT OF ERROR

{¶ 12}  Boyd asserts a single assignment of error:

> Because the jury instructions did not require unanimity on Alex Boyd's convictions for aggravated burglary and kidnapping, his convictions were in violation of his right to jury unanimity and due process of law under the Fourteenth Amendment to the United States Constitution, and Section 10, Article I of the Ohio Constitution, and Crim.R. 31(A).

## III.  DISCUSSION

{¶ 13}  Boyd's counsel did not object to the unanimity jury instructions at trial. "[A] party forfeits error concerning jury instructions if the party fails to object before the jury retires. *State v. Jackson*, 92 Ohio St.3d 436, 444, 2001-Ohio-1266." *State v. Martin*, 10th Dist. No. 07AP-362, 2007-Ohio-7152, ¶ 48.  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).  *See also Martin* at ¶ 49.

> First, there must be an error, i.e., a deviation from a legal rule. * * * *United States v. Olano* (1993), 507 U.S. 725, 732 * * * (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * [S]ee, also, *Olano*, 507 U.S. at 734 * * * (a plain error under Fed.R.Crim.P. 52[b] is " 'clear' or, equivalently, 'obvious' " under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

*Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68.

{¶ 14}  In most cases, a general instruction on the requirement that the jury decide the case unanimously is sufficient. *State v. Johnson*, 46 Ohio St.3d 96, 104 (1989) *overruled in part not relevant here by State v. Jenks*, 61 Ohio St.3d 259, 282 (1991). However, the Supreme Court of Ohio has also recognized that:

> [I]f a single count can be divided into two or more "distinct conceptual groupings," the jury must be instructed specifically that it must unanimously conclude that the defendant

committed acts falling within one such grouping in order to reach a guilty verdict. *United States v. Gipson* (C.A. 5, 1977), 553 F.2d 453, 458; *accord United States v. Beros*, [833 F.2d 455,] 461 [(3d Cir.1987)] (where there appears a possibility of jury confusion in light of the allegations made and the statute charged, an augmented general instruction may be necessary to ensure that the jury understands its duty to unanimously agree to a particular set of facts); *United States v. Echeverry* (C.A. 9, 1983), 698 F.2d 375, modified (1983), 719 F.2d 974, 975; *United States v. Payseno* (C.A. 9, 1986), 782 F.2d 832, 837; but, see, *Berrisford v. Wood* (C.A. 8, 1987), 826 F.2d 747, 754.

*Johnson* at 104-05. Yet, the Supreme Court also has explained:

In determining whether the state has impermissibly interfered with a defendant's Crim.R. 31(A) right to juror unanimity and the due process right to require that the state prove each element of the offense beyond a reasonable doubt, the critical inquiry is whether the case involves "alternative means" or "multiple acts."

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.

" ' "In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt." ' " (Footnote omitted.) *State v. Jones* (2001), 96 Hawaii 161, 170, 29 P.3d 351, quoting *State v. Timley* (1994), 255 Kan. 286, 289-290, 875 P.2d 242, quoting *State v. Kitchen* (1988), 110 Wash.2d 403, 410, 756 P.2d 105.

*State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 48-50; *see also State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 138 (remarking that the question of whether a general unanimity instruction is sufficient despite the existence of alternative means is whether a reasonable fact-finder could have found each means proved beyond a reasonable doubt by the evidence).

{¶ 15} In this case the trial judge gave only a general instruction, "you must unanimously agree on your verdict." (Jury Instructions, 13.) Nevertheless, it is difficult to view the criminal acts by Boyd as "distinct conceptual groupings" when the testimony by S.W. vividly described a single, drawn-out continuum of violence. S.W. testified in relevant part:

> Okay. Starting from the beginning, I come in the house. I go in the kitchen start cooking. He's on the back patio wanting to get in. You know, first I find it funny. I'm laughing about it. He's actually obviously very serious.
>
> I go upstairs. I change my clothes. Radio's on. I ignore him. I go back downstairs. Still cooking. He's still out there I'm like, you know, he's not going to leave.
>
> * * *
>
> Q. At that point in time are you able to hear or observe anything of his demeanor?
>
> A. Yes.
>
> Q. Tell me what you heard and what you observed.
>
> A. He was getting even more angrier and angrier. The kicks got stronger and stronger as I noticed he was - - I could tell, you know, you can kick the door and maybe it won't budge, keep kicking it. And it starts wiggling a little bit. Then you kind of get scared like, oh, snap.
>
> Well, at that point it was, like, that last kick rushed the door. And the chair actually kind of - - it didn't open the door all the way. But it gave him just enough room to kick and then kick again and get in the door.
>
> From then I'm in the kitchen. He grabs me. I'm screaming. All the yelling. I don't know. All the yelling. I know we were screaming at each other. And I find myself in the living room.

Q. How did you find yourself in the living room?

A. He's grabbing me. I'm in the living room. We're fighting as far as like I'm screaming at him. I'm telling him to get off of me. He's not getting off of me. I'm screaming Alex. I'm telling him get off of me. Leave me alone. Stop. He's smacking in the face. I tell him to stop smacking me. Get off of me. He's saying something to me. I'm screaming. He chokes me with his arm. With his right arm he puts it around my neck. I pass out fast. I get back up. I'm screaming. I'm crying. At that point I'm mad. I'm ready to fight. We're screaming at each other. I don't know what I'm saying to him. I don't know what he's saying to me.

He's fighting me. I tell him to get off of me. Get off of me. And I know I'm getting smacked in the face. I'm getting madder. I go grab the rice that's on the stove from cooking because it's hot. I use that as my something I think he's going to leave me alone and get off of me. So I have the rice. I'm moving it around in my hand. I'm shaking. The rice pan is shaking. I'm trying to throw it at him. I'm scared to throw it at him so using it making him think I'm going to throw it at him and hit him with it.

I'm going around the table chasing him. Leave me alone. Get away. Get out. The more I move with the rice to try to throw it at him, the more rice pan - - the more the rice comes out the pan. It doesn't hit him. Scared to hit him with it. He thinks it's funny. He thinks this is a game. He's laughing. I'm screaming. I'm crying. Get out. Get out. Leave me alone. The rice is gone. There's no more rice in the pan.

Now I feel like I'm stuck. He's smacking me. Then I want to get out. He's not letting me out. He tells me to calm down. I can't calm down. So I grab my chair. I want to try to get out. So I feel like I'm trapped in this room. I can't go anywhere. So I take the chair attempt to throw it at the window. Throw it at this window that's in the living room. He chokes me with his right arm. I fall to the ground. I get back up. Charge at him. He smacks me. Chokes me again.

He drags me up the steps by my hair. I'm going up the steps. Get off me. Get off of me. Get off of me. As I go up the steps I don't know what he's saying. We're going up the steps. I'm screaming. Find myself in the bedroom. We're in the bedroom. We're arguing. We're fighting. The door's shut.

I'm standing by the window. The blinds are fully blind. So as he's smacking me, I'm trying to fight him. So I grab the blinds down try to fight him with the blinds. I'm swinging the blinds. Not hitting him. He's telling me if you hit me I'm gonna kill you. I'm gonna hurt you. I'm scared to hit him back. So I'm swinging making him think that I'm gonna hit him with it. Making him think it's gonna stop. That doesn't work. The blinds are broken.

Everything's tore up. I take the radio speaker. I break it by being so angry that I snatched it off the thing. And it immediately came out of the cord. I go to try hit him with it. Alex then has his gun. He's pointing it at me screaming if I want to get out, you're gonna have to kill me, or if you want to get out vice versa.

Then I'm standing by the closet. I'm screaming. I don't know what to do. I'm afraid. I'm scared. I think he's gonna shoot me so I'm telling him don't shoot me. At that point he has the authority. And there's no more fighting back for me because there's a loaded gun in front of my face.

Alex then tells me we have tattoos, we had tattoos,[1] he owned me. And, you know, if I wanted to go anywhere do anything I'm going in a body bag. So I'm scared. I feel like he's gonna shoot me. He tells me that if I want to get out, I have to kill him. So at that point he gives me the gun. It's shaking. I'm shaking. I have it in my hand. I'm afraid. He's hitting me. I got the gun. I don't have enough fear to actually shoot it. So I'm pointing it at him telling him to leave me alone.

Eventually he gets the gun back. We're fighting. We're on the bed now. He's trying to take my clothes off of me He's screaming "I love you. I'm sorry. I want to be with you."

We're fighting. As he's trying to get my clothes off of me, I'm using my legs. So to try to make it so that he gets off of me so I'm choking him with my legs. Eventually when he goes to pull out his penis I grab it. I have it. Then I feel like I'm in power. I'm in control. I take his - - I'm holding his penis. I get off the bed. Open the - - I have him, I'm screaming at him. I'm opening the door and I'm in the hallway. I'm yelling something at him. He's just showing as if he's hurting because I'm grabbing his stuff.

---

[1] Boyd has S.W.'s first name tattooed on his neck and she has his initials on her arm.

And we're in the - - we're by the rails where you come up at the steps between the bathroom and going downstairs. I'm so angry I'm screaming at him. And he acts as if he's about to pass out because I'm holding his stuff so hard. I told him that I was gonna become attachable. It scares me because he's about to pass out.

So I let him go. And instantly, quickly he chokes me. I'm back in the room again. The door's shut. And then I'm stuck. I'm feeling frustrated. I'm feeling angry. I'm feeling like my life's about to end. I don't know what 's about to happen. All I know is he's in here. There's a loaded gun in here. He wants to kill me. And I don't know what to do. So we're fighting again. We're fighting again.

Finally I'm on the bed. My head is to the bottom of the bed. He's a little bit stronger than me. So we fighting on the bed, trying to get my clothes off, telling me that he loves me.

In the midst of the fight, he gets my clothes off of me. He takes his gun. He sticks it in my privacy. And he takes it out. He licks it. He tells me that my privacy's that's why he loves me. We're fighting. I'm hurting. I'm screaming get off of me, get off of me the whole time. He tells me to shut up.

From the midst of us fighting I end up on the other end of the bed. My clothes are off. He's having sex with me. I told him don't let him me rape me. He says I know. Don't cry. Please don't cry. I love you. Please don't cry.

Get off of me then. Get off of me then. If you love me you wouldn't do this to me. He goes, "I do love you. Don't cry. Oh, I'm about to come." He comes.

Still in the room. Things have kind of calmed down. Although I'm still scared shitless because I don't know what's going to happen. He's kind of in almost as if he got his cool back where he's not angry anymore after sex. We're in the room. Once it's over I think, you know, now he got what he wants everything's cool. You know, everything's not cool.

I have to stay in the room. He's making me stay in the room now. I can't get out. I can't go anywhere. So I'm stuck in the room. Every time I try to get out, he goes to either try to choke me, try to make me pass out, tell me I ain't going nowhere, tell me he's gonna shoot me, he's gonna kill me. So I'm struck in this room. I can't do anything.

* * *

I can't get out the window. The window's high up. I have nothing to throw out the window to to get out. I've already broken everything in the room that can be broke.

* * *

Eventually after everything calms down, this is a long process, we go to sleep. Alex is fine. He has his gun. "Don't move. Don't act crazy." I didn't do anything. I didn't want to get shot. I didn't want to lose my life.

(Tr. Vol. II, 402-11.)

{¶ 16} In fact, even when the prosecutor attempted to clarify the timeline by questioning, S.W. was unable to be more specific:

Q. So it's clear that whole situation you just told me, is that what happened Sunday night when he kicked the door in?

A. This is from the time the door got kicked in to the time that the police came.

Q. Okay. Okay. So in here we have a Monday. What you were just telling us, are you saying that's what happened?

A. Yes. And the police, the detectives are registering days. My mind is registering the whole situation of what happened. In my mind there's not no dates going past. There's not no months going past. There's no nothing going past of what I'm going through in the room, in the house, in the situation. No time. I don't have no recollection of any time span of nothing.

(Tr. Vol. II, 412-13.)  In short, while it is true that Boyd committed multiple criminal acts toward S.W. in the time that he held her within the apartment for more than a day, as S.W.'s testimony demonstrates, it is difficult to see how these offenses could be divided into "distinct conceptual groupings" in the same manner which, for instance, a robbery spree might be divided by targets or dates.

{¶ 17} We have previously decided a case somewhat factually similar to this. In *State v. Marrero*, 10th Dist. No. 10AP-344, 2011-Ohio-1390, ¶ 3, a defendant and his girlfriend had been fighting verbally.  When the girlfriend picked up the defendant in the car, the defendant began to hit her and would not allow her to leave the car. *Id.* at ¶ 4. He

forced her into the backseat, choked her, and began driving while continuing to punch her. *Id.* She managed to escape when the defendant stopped at a stoplight. *Id.* The defendant chased her and attempted to drag her back to the car by her neck and hair but was deterred in this attempt by the intercession of passersby. *Id.* at ¶ 4-5. Although in that case there were (as there are here) multiple criminal acts in the course of conduct, it was a single course of conduct and neither of the offenses with which the defendant was charged (domestic violence, in violation of R.C. 2919.25, and abduction, in violation of R.C. 2905.02) could cogently be further "divided into two or more 'distinct conceptual groupings.' " *Johnson* at 104; *Marrero* at ¶ 96-101. We explained, " '[j]urors need not agree on a single means for committing' the offense, because different 'jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Id.* at ¶ 100, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 228, citing *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991); *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990); *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 186-88.

{¶ 18} Boyd, in his brief, alleges that the jury could have disagreed about which statutory path justified Boyd's conviction for both kidnapping and aggravated burglary. That is, in this case, the jury was instructed that they should find Boyd guilty if they found that he "knowingly, by force trespassed in an occupied structure when another person other than an accomplice of the defendant was present, with purpose to commit therein any criminal offense, and the *defendant inflicted or attempted to inflict physical harm upon another, [S.W.],* **and/or** *had a deadly weapon on or about his person or under his control.*" (Emphasis added.) (Jury Instructions, 6.) Boyd argues that the jury should have been required to agree upon which of the alternatives was true—inflicted harm or deadly weapon. Similarly, the jury was instructed that they should find Boyd guilty if they found that he "knowingly and by force removed [S.W.] from the place where she was found or restrained her of her liberty for the purpose *of facilitating the commission of a felony or flight thereafter, to wit: Aggravated Burglary and/or Rape;* **and/or** *terrorizing the victim* **and/or** *engaging in sexual activity with the victim against the victim's will.*" (Emphasis added.) (Jury Instructions, 9.) Again, Boyd argues that the jury should have

had to agree upon whether Boyd removed and restrained S.W. in order to facilitate crime, terrorize, or engage in sexual activity with S.W. against her will.

{¶ 19} Boyd's arguments, despite attempts to construe them as multiple acts arguments, are paradigmatic alternative means arguments. Jurors are permitted to disagree about the means by which the offender achieved his own guilt, so long as substantial evidence supports each of the possible means and the jury is unanimous as to the ultimate result. *See, e.g.*, *Fry* at ¶ 125-38. Thus, the question is not whether the jurors had to agree on the alternatives Boyd raises; they did not. The question is whether substantial evidence underlay each of the alternatives.

{¶ 20} S.W. testified that Boyd raped her with a gun, slapped her, dragged her by her hair, and choked her to the point of unconsciousness.  In addition, a Glock 22-handgun was found near the scene without cobwebs and by expert testimony was found to have on it both S.W.'s and Boyd's DNA, consistent with her testimony.  This evidence supports a finding that Boyd possessed and used a deadly weapon, including to inflict physical harm upon S.W.  *See* R.C. 2911.11(A)(1) and (2); *see also* R.C. 2901.01(A)(3) (defining physical harm as "any injury, illness, or other physiological impairment, regardless of its gravity or duration"); R.C. 2923.11(A) (defining "deadly weapon" in relevant part as "any instrument, device, or thing capable of inflicting death, and designed * * * for use as a weapon").

{¶ 21} Ohio criminal statute provides, "[a] person acts purposely when it is the person's specific intention to cause a certain result" which can be inferred from the manner in which the act is done and other circumstances in evidence. R.C. 2901.22(A); *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus. S.W. testified that Boyd kept her in the room of the apartment against her will after he kicked in the door, attacked, and raped her.  This is corroborated by police testimony that the patio door showed signs of forced entry, the presence of Boyd's sperm in her vagina as testified to by one or more experts, and both his and her DNA on the gun consistent with her testimony of how he used it during the acts to which she testified. This is substantial evidence from which a jury could have inferred that it was Boyd's specific intention to keep S.W. under his control within the apartment to facilitate the rape and prevent her from calling the police and facilitating his escape from responsibility for the aggravated

burglary. S.W. also testified that Boyd penetrated her vagina with a loaded gun and licked it as a prelude to raping her with his penis. This was corroborated by the presence of Boyd's sperm in her vagina and the DNA of both Boyd and S.W. on the muzzle of the gun. A jury could have reasonably inferred a purpose to terrorize S.W. from this evidence and could also have inferred that Boyd's purpose was to engage in sexual activity with S.W. against her will.

{¶ 22} There was substantial evidence to support all of the alternative means presented to the jury by which Boyd might have been found to have committed each offense for which he was convicted. Under these circumstances, the jury therefore was not required to agree on the means by which the crimes were committed so long as the members of the jury unanimously agreed on the ultimate result. *See, e.g., Fry* at ¶ 125-38; *Gardner* at ¶ 49. The record establishes that the jury was unanimous on the result; all 12 jurors signed the verdict forms and the jury was polled, with jurors' individual answers showing no inconsistency with the verdict. This is all the unanimity that was required in this case. The general instruction given by the trial court was sufficient and does not amount to error, plain or otherwise. For these reasons, we decline to find plain error, especially considering that, based on the evidence the jury heard, we find that Boyd's substantial rights were not affected. That is, any error in the trial court's instruction did not and could not have affected the outcome of the trial.

## IV. CONCLUSION

{¶ 23} We overrule Boyd's assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and LUPER SCHUSTER, JJ., concur.

———————————