[Cite as *State v. Elkhabiry*, 2025-Ohio-1028.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                    :

                                                   No. 22AP-445

v.                                                :   (C.P.C. No. 21CR-3215)

Amir Elkhabiry,                                  :   (REGULAR CALENDAR)

    Defendant-Appellant.                   :

                                                   :

---

D E C I S I O N

Rendered on March 25, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Paula M. Sawyers* for appellee.

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes* for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Amir Elkhabiry, appeals from the judgment of the Franklin County Court of Common Pleas entered after a jury convicted him of aggravated murder and having a weapon while under disability in the shooting death of Melly Mel Smith. Mr. Elkhabiry asserts that the admission of videotaped statements of bystanders to police officers violated his constitutional right to confront witnesses under the United States and Ohio Constitutions, and he challenges to the legal sufficiency and the manifest weight of the evidence that supported the verdict. Finding no merit to these arguments, we affirm the judgment.

## I. Factual and Procedural Background

{¶ 2}   A grand jury indicted Mr. Elkhabiry on one count of aggravated murder in violation of R.C. 2903.01, one count of murder in violation of R.C. 2903.02, one count of felony murder in violation of R.C. 2903.02, and one count of having weapons while under disability in violation of R.C. 2923.13.  (Aug. 10, 2021 Indictment.)  Each murder count carried a firearm specification under R.C 2941.145(D) and a repeat violent offender specification under R.C. 2941.149(A).  *Id.*  The charges stemmed from a late-night shooting at an apartment complex, where Columbus police officers found Mr. Elkhabiry inside the trunk of a parked car with the murder weapon shortly after the shooting.

{¶ 3}   Prior to trial, the state filed a motion to admit video recordings of statements made by two witnesses questioned by police officers minutes after arriving at the apartment complex while searching for the shooter.  (Mar. 8, 2022 Mot. to Admit.)  The video footage was recorded by the officers' body-worn cameras ("BWC").  In the first video, a woman in a white jacket is seen pointing towards a set of apartment stairs and walking towards Officer Ryan VanFossen, the first-arriving responder, immediately after he arrives in the complex parking lot.  (Ex. J.)  He asks another woman in a black coat standing under a tree, later identified as S.H., "where'd the people go that were shooting?"  *Id.*  S.H. responds: "[T]hat way."  *Id.*  He goes up the stairs and encounters the victim, Melly Mel Smith, who appears severely wounded.

{¶ 4}   The second video documents Officer Larry Whitman's arrival.  He speaks with S.H.  (Ex. K.)  The following is an approximation of their exchange, as the audio quality of her responses is poor:

> Q: Did you see what kind of shirt or jacket or anything he was wearing?
>
> A: For the guy it was like a jean jacket.
>
> Q: Okay, for the girl?
>
> A: For the girl it was leather jacket and her pants was pink.
>
> Q: And did you see if she actually did the shooting, or did you just see them run?
>
> A: The guy definitely did the shooting . . . she kept coming back . . . I don't know if she was helping him or . . .

Q: And were you the one who said they got in a car, or seen a car?

A: I was the one that saw a black car . . . I don't know if they got in it, I just saw a black car.

Q: Do you think the shooting happened up here?

A: [unintelligible] He was running . . .

(Ex. K.)

{¶ 5} After this exchange, officers are seen encountering bullets and shell casings on the ground at the bottom of the apartment steps. Officer Whitman then questions S.M. in the parking lot. Their exchange is muted on the video because of the trial court's eventual ruling. The trial court described her as "essentially describing and pointing out everyone and [saying] that he may be in the trunk or [she] saw guns being put in the trunk." (Mar. 14, 2022 Tr. at 13.) After Officer Whitman's exchange with S.M., he and other officers approach a vehicle and apprehend Mr. Elkhabiry in its trunk.

{¶ 6} The state argued that the women's statements were admissible under Evid.R. 803(2), the excited utterance exception to the rule against hearsay, and that they were nontestimonial statements made during an ongoing emergency that did not implicate Mr. Elkhabiry's Confrontation Clause rights. Mr. Elkhabiry's attorney responded that the statements were testimonial because "asking witnesses to identify the shooter was an evidence-gathering activity which was not required to address the emergency." (Mar. 11, 2022 Def.'s Resp. at 5.) The admission of their statements in lieu of their testimony at trial violated Mr. Elkhabiry's rights under the Confrontation Clause because he would have "no opportunity to cross-examine the declarants," his attorney argued. *Id.* at 6. In addition, he argued that the statements were inadmissible hearsay not subject to the excited utterance exception because the witnesses appeared calm. *Id.* at 7-8.

{¶ 7} The trial court reviewed the videos and heard the parties' oral arguments on the motions immediately before trial. (Tr. at 5.) The trial court ruled that both videos could be played in their entirety, but the statements made by S.M. had to be muted. "Because she was calm, cool, collected," the trial court ruled that the statements did not qualify as excited utterances. *Id.* at 14.

{¶ 8} Mr. Elkhabiry's jury trial began on March 14, 2022. The state's first witness was Officer VanFossen, who testified that he responded to an emergency call at 1944

Fountainview Court on February 18, 2021. (Tr. at 184.) After receiving the call, he turned on his BWC at 1:06 a.m. and arrived at the scene six minutes later. *Id.* at 185. Officer VanFossen stated that he spoke with S.H. and then encountered the victim, Melly Mel Smith, on the second story landing of an apartment building. *Id.* at 186. He could not stop to treat Mr. Smith because, as a first responder arriving with the whereabouts of the shooter still unknown, he had to secure the scene. *Id.* Afterwards, he accompanied the medic to the hospital with the victim. *Id.* at 188. A copy of Officer VanFossen's BWC footage was played for the jury. (Ex. J.)

{¶ 9} Officer Whitman testified next. (Tr. at 197.) He also activated his BWC before arriving at the scene. *Id.* at 198. He testified that he spoke with a woman (S.H.) as he arrived and noticed "several spent casings along with several live rounds" on the ground. *Id.* at 200. Officer Whitman began to walk where S.H. had directed him, and he encountered another woman, S.M. *Id.* at 201.

{¶ 10} Officer Whitman's BWC footage was played for the jury, but S.M.'s responses after he asked her what she saw were muted due to the trial court's ruling. (Ex. K.) After interacting with her, he and other officers went to a maroon Honda Accord where they found a person hiding in the trunk. Tr. at 201. Officer Whitman identified Mr. Elkhabiry as the person they found in the trunk. *Id.* at 202.

{¶ 11} According to Officer Whitman, Mr. Elkhabiry "immediately popped out of the trunk" and tried to walk away from the officers, but another officer "used a level 1 take-down to get him onto the ground." *Id.* at 203. The officers seized Mr. Elkhabiry's right hand and "gave multiple commands to give up" his left hand as "he was reaching underneath," which Officer Whitman was concerned was an effort to grab a weapon. *Id.* After a "struggle," the officers handcuffed Mr. Elkhabiry. *Id.*

{¶ 12} Officer Whitman was shown a photo of S.M. and identified her as the second witness he spoke to. *Id.* at 204. He testified that after speaking with her again, he went to a second-floor apartment. *Id.* There, he knocked, and a woman came out of the apartment who fit the description that the first witness, S.H., had provided of the woman seen with the shooter. *Id.* at 204-05. Officer Whitman's only other involvement was to stand guard at the door of the apartment until crime scene investigators arrived to search it. *Id.*

{¶ 13} Officer Alex Zamora also testified. *Id.* at 366. On February 18, 2021, he was working with a partner, Officer Michael Clepper, and they responded to the emergency call at 1944 Fountainview Court. *Id.* at 367. Officer Zamora's BWC footage, which included Mr. Elkhabiry's apprehension, was played for the jury. *Id.* at 371. Officer Zamora identified Mr. Elkhabiry as the individual he and the other officers arrested. *Id.* He described Mr. Elkhabiry as noncompliant when they attempted the arrest, as he "had his arms tucked underneath him" with his hands gripped together when the officers tried to handcuff him. *Id.* at 372. He was concerned that Mr. Elkhabiry might "have another weapon, something underneath him" that might be used against them. *Id.* Officer Zamora specified that he said "another weapon" because he saw Mr. Elkhabiry holding a gun. *Id.* The weapon could not be seen on the BWC footage, although officers could be heard shouting "drop the gun." *Id.* at 373.

{¶ 14} Officer Michael Clepper also testified about his experience at the scene. *Id.* at 380. Video from his BWC was also played for the jury. *Id.* at 383. Officer Clepper identified Mr. Elkhabiry as the man they apprehended that evening. *Id.* He was "100 percent" sure that he saw Mr. Elkhabiry holding a weapon. *Id.* at 385. In Officer Clepper's recollection, Mr. Elkhabiry "did drop the gun before he exited the trunk. But when we opened up the trunk, he popped up, and he had a gun in his hand. It was facing down toward the bottom of the car." *Id.* at 387.

{¶ 15} Detective Gary Cooper, who works in the Columbus Division of Police crime scene search unit, testified about the evidence collected at the scene. *Id.* at 218. He stated that "most of the evidence" was collected by "the sidewalk leading to 1944 [Fountainview]," the apartment building where the victim was found on the second-floor landing. *Id.* at 235. Detective Cooper identified photographs of a multiple spent nine-millimeter casings and live Winchester .40 caliber rounds found on the ground there. *Id.* at 241-46. He also authenticated photographs of "bullet strikes on the wall" that were "going up the stairs" to the landing. *Id.* at 241.

{¶ 16} Detective Cooper executed a search warrant at 1948 Fountainview, Apartment C. *Id.* at 244-45. There, officers found a gun cleaning kit, a magazine, a gun case, and ammunition, including Winchester .40 caliber that was "consistent" with the ammunition recovered outside. *Id.* at 247. After collecting the items in plain sight, they

also found a Glock 23 .40 caliber handgun wrapped in camouflage pants inside a clothes hamper.  *Id.* at 251.

{¶ 17}  In addition, Detective Cooper identified photographs of the vehicle where Mr. Elkhabiry was found.  *Id.* at 250.  After the vehicle was impounded, a further search of it uncovered a Springfield Armory XD-S nine-millimeter handgun, a pair of black gloves, and "a Glock extended .40 caliber magazine [with] 14 live cartridges, all of which were Winchester 40 S&Ws."  *Id.* at 256.  According to Detective Cooper, the gun case found in apartment 1948-C was a Springfield Armory gun case, "the same maker" as the gun found in the car trunk.  *Id.* at 256.  Apart from the photographs of the evidence, the detective identified the items themselves for the jury.  *Id.* at 260-74.

{¶ 18}  Caleb Worley, a forensic scientist at the firearms identification unit of the Columbus Division of Police, also testified.  *Id.* at 301.  Mr. Worley tested the Springfield Armory XD-S nine-millimeter handgun and found it operable.  *Id.* at 314.  After firing test rounds with the weapon, he compared the spent casings to the shell casings recovered from the scene at 1944 Fountainview and concluded that, "based on the marks in multiple areas of the cartridge cases, [they] were fired by this pistol."  *Id.* at 315.  The results from the recovered bullets and bullet fragments were inconclusive.  *Id.* at 316.  They were "damaged and deformed," which "obscured the individual characteristics" that would have matched them to the recovered weapon.  *Id.*  "But the class characteristics," which included "the number of lands and grooves, the width of those impressions were the same as this pistol."  *Id.* at 317.  Thus, Mr. Worley concluded that the bullets and bullet fragments couldn't "be ruled out as having been fired from this gun."  *Id.* at 316-17.  Another examiner verified Mr. Worley's findings.  *Id.* at 317.

{¶ 19}  The state also called Dr. Anne Shepler, the forensic pathologist who performed the autopsy on Melly Mel Smith, as a witness.  *Id.* at 340.  She testified that the cause of Mr. Smith's death was multiple gunshot wounds, and that the manner of his death was homicide.  *Id.* at 343-44.  The first gunshot wound that Dr. Shepler described was a "gunshot wound to the back" that entered on the left side, fired from an indeterminate range, and exited the upper left shoulder.  *Id.* at 346-47.  That gunshot injured Mr. Smith's ribs, left lung, left scapula, resulting in "a left hemothorax, which is blood in the chest cavity on the left side."  *Id.* at 347.  The gunshot wound followed an upward trajectory, "right to

left and back to front." *Id.* The second gunshot wound was a superficial "graze wound" to the chest. *Id.* at 353. The third gunshot wound was to Mr. Smith's right thigh from an indeterminate range. *Id.* at 354. It injured the skin and fractured the right femur. *Id.* Dr. Shepler was able to retrieve bullet fragments from the third wound. *Id.* The fourth gunshot wound injured Mr. Smith's left leg, entering from the back of the leg and causing injuries to the skin and "a compound fracture of the left tibia and left fibula." *Id.* at 355. Dr. Shepler recovered a bullet from the fourth gunshot wound. *Id.* She was unable to say which specific wound caused Mr. Smith's death because, with the exception of the superficial graze wound to the chest, he could have died from any of the others individually. *Id.* at 362. The first wound pierced Mr. Smith's lung, which alone could have been "lethal," or he could have died from the bleeding caused by the gunshot wounds to his legs. *Id.*

{¶ 20} Detective Shane Carnes also testified. *Id.* at 389. He was the lead detective assigned to investigate the death of Melly Mel Smith. *Id.* at 391. He confirmed that the initial 911 call occurred at 1:05 a.m. *Id.* at 392. Detective Carnes identified a photograph, State's Exhibit K4, as T.T. *Id.* He also identified a photograph of the vehicle that Mr. Elkhabiry had been found in as registered to T.T. *Id.*

{¶ 21} Detective Carnes interviewed Mr. Elkhabiry after the arrest. *Id.* at 394. A video recording of the interview was played for the jury. *Id.* at 396. During the interview Mr. Elkhabiry was shown a photograph of T.T. and he identified her as his girlfriend. (Ex. N.) He denied being with her that evening, and stated that he was at his cousin's house several streets away earlier. *Id.* Mr. Elkhabiry denied knowing that T.T. lived in the apartment complex and stated that "she comes to visit me at my mom's." *Id.* He expressed surprise when he was told that the car he was found in belonged to T.T., and that she lived in the complex. *Id.* In his recounting, Mr. Elkhabiry was "just walking through the area" and heard gunshots "in the vicinity." *Id.* He said that the trunk of the car was open and he got inside to hide. *Id.* Mr. Elkhabiry denied knowing the victim, firing a gun in the last nine or ten hours, or touching the gun that was found in the trunk. *Id.*

{¶ 22} Detective Carnes testified that normally, "as a matter of routine," a suspect that investigators "think may have fired a firearm" is tested for gunshot residue and a DNA sample is taken from them as well. *Id.* at 397. However, in this case, "after reviewing all the evidence and consulting with the prosecutor's office, the fact that the suspect was in the

trunk of the car with the murder weapon in his hand" led them to conclude that "there was no reason to" conduct either test. *Id.* at 397-98. The purpose of such tests is to establish "a linkage" to a suspect when the weapon is found elsewhere, Detective Carnes testified, which was not necessary in this case. *Id.* at 397.

{¶ 23} Mr. Elkhabiry's attorney moved the court for a judgment of acquittal under Crim.R. 29 on the grounds of legally insufficient evidence, which was denied. *Id.* at 455-56.

{¶ 24} The jury found Mr. Elkhabiry guilty on all three murder counts, along with the firearm and repeat violent offender specifications. The court found Mr. Elkhabiry guilty of the count of having a weapon while under disability, which carried a firearm specification. The two murder counts merged with the aggravated murder count, for which the court sentenced Mr. Elkhabiry to 20 years to life, to be served concurrent with a 36-month term for having a weapon while under disability. The firearm specifications accompanying those convictions resulted in two 54-month terms, both consecutive and consecutive to a 12-month term for the repeat violent offender specification.

{¶ 25} Mr. Elkhabiry filed a timely notice of appeal and assigns the following as error:

> [I.] The trial court erred by admitting evidence which violated the Federal and State Confrontation Clause.
>
> [II.] The jury's verdict was against the manifest weight of the evidence.
>
> [III.] The trial court erred when it denied Mr. Elkhabiry's Rule 29 motion for acquittal.

## II. Analysis

{¶ 26} In the first assignment of error, Mr. Elkhabiry argues that the trial court violated his Confrontation Clause rights under the United States Constitution and the Ohio Constitution by admitting the video footage that had recorded statements from persons at the scene responding to officers' queries.

{¶ 27} Evidentiary rulings are generally reviewed for an abuse of discretion, but appellate courts will "review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.2010). Although Mr. Elkhabiry's counsel filed a

response to the state's motion to admit this evidence that we construe as a motion in limine seeking to exclude it, he failed to object to its admission during trial, waiving all but plain error review. *E.g.*, *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 133 (where "the defense did not renew its objections at trial to the introduction of evidence" after ruling on motion in limine, it "waived all but plain error" review).

**{¶ 28}** "If the defendant failed to raise an error affecting substantial rights at trial, an appellate court reviews the error under the plain error standard in Crim.R. 52(B)." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 14. The rule states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). The defendant "bears the burden of proof to demonstrate plain error on the record" before the appellate court. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16. To do so, the defendant must first show "a deviation from a legal rule" amounting to an error. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Hill*, 92 Ohio St.3d 191, 200 (2001). Second, the noticed error must be plain, meaning that it reveals "an 'obvious' defect in the trial proceedings." *Id.*, quoting *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001). Third, the trial court's error must have affected not only the defendant's substantial rights, but "the outcome of the trial" as well. *Id.* Ultimately, the defendant must "demonstrate a reasonable *probability* that the error resulted in prejudice" in order to satisfy the Crim.R. 52(B) standard of plain error. (Emphasis sic.) *Rogers* at ¶ 22.

**{¶ 29}** The Sixth Amendment of the United States Constitution guarantees the right of a criminal defendant "to be confronted with the witnesses against him" during trial. Article I, Section 10 of the Ohio Constitution guarantees a criminal defendant the right "to meet the witnesses face to face" during trial, which the Supreme Court of Ohio has interpreted to parallel "the United States Supreme Court's interpretation of the federal guarantee." *State v. Carter*, 174 Ohio St.3d 619, 2024-Ohio-1247, ¶ 33, citing *State v. Self*, 56 Ohio St.3d 73, 78 (1990). The purpose of the Confrontation Clause "is to prevent unchallenged testimony from being used to convict an accused—a safeguard that applies to both federal and state prosecutions." *Carter* at ¶ 27. The clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *Ohio v.*

*Clark*, 576 U.S. 237, 243 (2015), quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004). The prohibition applies only to testimonial statements, such as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford* at 68. *See also Davis v. Washing*ton, 547 U.S. 813, 821 (2006) (stating that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause").

{¶ 30} To determine whether a statement is testimonial in nature or not, courts apply the "primary purpose" test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis* at 822.

{¶ 31} Whether the primary purpose of a police interrogation is to facilitate police officers' ability to meet an ongoing emergency requires that a court "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). In other words, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360.

{¶ 32} In this case, Officer VanFossen arrived minutes after a shooting, found the dying victim, and questioned bystanders about the shooter's location. Officer VanFossen asked S.H. where to the shooter was, and Officer Whitman asked her for a description of the shooter. Any reasonable officer arriving minutes after a shooting would be primarily preoccupied with apprehending the shooter to prevent further violence and would ask questions with that purpose in mind. Furthermore, any reasonable bystander would respond with the primary purpose of assisting the officers in apprehending the perpetrator who had just committed a shooting in their residential complex. Under these

circumstances, S.H.'s statements responding to the officers' questions were nontestimonial responses to address an ongoing emergency. Thus, their admission at trial did not implicate Mr. Elkhabiry's Confrontation Clause rights.

{¶ 33} This application of the primary purpose test is not novel. In *Bryant,* Detroit police officers responded to an emergency call reporting a shooting, arrived at the scene, and found the victim "lying on the ground" with "a gunshot wound to his abdomen" and on the verge of death. *Id.* at 349. The victim identified Bryant as the shooter in response to the officers' questions, and they left "within 5 to 10 minutes" to travel to the Bryant's house. *Id.* The Supreme Court held that the victim's responses "were not testimonial hearsay" and did not violate the defendant's Confrontation Clause rights because "the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively" demonstrated that their primary purpose was to assist in the resolution of an ongoing emergency. *Id.* at 377-78.

{¶ 34} Mr. Elkhabiry argues that the statements were testimonial because "there was no ongoing emergency," an assertion that is inconsistent with the objective circumstances surrounding the officers' questioning. (Brief of Appellant at 10.) His only support for this assertion is to cite the "calmness of their tone and the passage of more than ten minutes since the time of the shooting," but this characterization of the circumstances does not address the primary purpose of the exchange, which is the relevant test to determine the testimonial nature of such statements.[1] *Id.* Mr. Elkhabiry makes no attempt to "objectively evaluate" the circumstances under which the exchange occurred, and instead insists that the officers were actually engaged in evidence gathering for trial. *Bryant* at 359. Their questioning may have led to the creation of inculpatory evidence, but that was not its primary purpose where an active shooter was at large and police officers sought to apprehend him. This is not to say that all statements uttered by witnesses in the aftermath of a shooting are nontestimonial, only that under the facts and circumstances of this case, their primary purpose was nontestimonial. *See State v. Wilcox,* ____ Ohio St.3d ____, 2024-

---

[1] Mr. Elkhabiry also claims that the statements of S.H. "do not fall into the excited utterance hearsay exception for the same reasons the statements were not made during an ongoing emergency." (Brief of Appellant at 11.) He makes no other attempt to challenge their admission under a hearsay exception. We defer to the trial court's assessment of S.H.'s demeanor when responding to the officers' questions. It was not plain error for the trial court to admit her responses under Evid.R. 803(2).

Ohio-5719, ¶ 13 (holding that officer's initial questioning of witness after shooting elicited nontestimonial statements because "he had no indication that the shooting suspect had been apprehended," but witness statements made after radio dispatch to officer informed him of suspect's arrest were testimonial, thus "statements made by the declarant evolved from being nontestimonial to testimonial during the course of police questioning"). In this case, the trial court did not err by ruling that the responses of S.H. were nontestimonial. Thus, Mr. Elkhabiry has not demonstrated "a deviation from a legal rule," as the first step of a plain error analysis requires. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 35} Even if Mr. Elkhabiry had identified a deviation from a legal rule affecting his substantial rights, he has not "demonstrate[d] a reasonable *probability* that the error resulted in prejudice," as the plain error standard requires. (Emphasis sic.) *Rogers* at ¶ 22. The state's case against him did not hinge on the admissibility of the statements he challenges. As discussed below, the evidence amassed by the state, including his capture with the murder weapon while trying to hide and then flee, was strong enough that there is no reasonable probability of a changed outcome had the jury not heard the statements in question. Because he cannot demonstrate that their admissibility amounted to plain error, the first assignment of error is overruled.

{¶ 36} In the second assignment of error, Mr. Elkhabiry challenges the manifest weight of the state's evidence that resulted in his convictions.

{¶ 37} The manifest weight of the evidence standard of review requires the appellate court to consider the state's evidence as an additional, or "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 38} Mr. Elkhabiry raises three arguments to support his contention that the manifest weight of the evidence did not support the jury's verdict. First, he argues that the description that the radio dispatcher relayed to Officer VanFossen and Officer Whitman, as heard on the video recordings of their BWC that were played for the jury, did not match his physical description, and the jury "failed to appreciate" this alleged discrepancy. (Brief of Appellant at 14.) However, although Mr. Elkhabiry quotes three of the dispatcher's descriptions, which variously describe a black male wearing a hoodie and a black male with dreadlocks wearing a hoodie and a jean jacket, he does not specify how these descriptions differed from his own physical appearance on the evening of the shooting. *See id.* Even if Mr. Elkhabiry had demonstrated some inconsistency between the dispatcher's descriptions and his appearance, however, "a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial." *State v. Bailey*, 10th Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 23, citing *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 27. The jury heard the dispatcher's descriptions and viewed the videotape of Mr. Elkhabiry's questioning after being apprehended that evening, saw what he was actually wearing, and therefore had the opportunity to evaluate and reconcile any inconsistencies in that evidence.

{¶ 39} Mr. Elkhabiry also argues that investigators failed "to appropriately investigate for the full truth" because they did not test the DNA collected from him, his girlfriend, or the victim, and they only tested him for gunshot residue. (Brief of Appellant at 15.) Detective Carnes explained at length why the investigators chose not to conduct the tests, and Mr. Elkhabiry's attorney was able to cross-examine him on this purported evidentiary deficiency. The reality was that Mr. Elkhabiry was captured hiding in his girlfriend's car trunk with the murder weapon, minutes after the shooting, a situation that the state considered sufficiently inculpatory to convince a jury of his guilt. The state was not required to expend more resources on forensic analysis where it believed it had enough evidence to prove its case.

{¶ 40} Mr. Elkhabiry's final argument concerning the manifest weight of the evidence criticizes the state for only presenting law enforcement witnesses, stating that the state "failed to present a single witness present at the scene at the time the shooting occurred." (Brief of Appellant at 16.) We have previously rejected the argument that the

state's failure to produce an eyewitness to a shooting necessarily demonstrates a deficiency in the manifest weight of the evidence, noting that the assumption "that additional eyewitnesses must have existed" is "purely speculative." *State v. Short*, 10th Dist. No. 22AP-543, 2024-Ohio-92, ¶ 29. If the state were required to produce an eyewitness to prove any murder charge, no murder where only the victim and perpetrator were present would ever be solved. Thus, "[t]he identity of a perpetrator may be established by the use of direct or circumstantial evidence." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18, citing *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046 and *State v. Reed*, 10th Dist. No. 08AP-20, 2008-Ohio-6082.

{¶ 41} Mr. Elkhabiry's argument does not address the state's evidence in light of the elements of the offenses he was convicted of, but we will address them for the sake of thoroughness. The indictment alleged that Mr. Elkhabiry "did purposely cause the death of Melly Mel Marquise Smith, while being under detention that resulted from having been found guilty of or having pleaded guilty to a felony," when charging him with aggravated murder with a firearm specification. (Aug. 10, 2021 Indictment at 1.) The firearm specification required the state to prove that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed a firearm, or used the firearm to facilitate the offense and that the offender previously has been convicted of or pleaded guilty to a firearm specification," and the parties stipulated to Mr. Elkhabiry's prior conviction for aggravated robbery with a firearm specification. R.C. 2941.145(D); (Tr. at 196-97, 215.)

{¶ 42} The relevant definition of aggravated murder states: "No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another." R.C. 2903.01(D). The parties stipulated that Mr. Elkhabiry had been "previously convicted of a felony offense, and as a result, was under detention within the meaning of Ohio Revised Code Section 2903.01, subdivision (D)" on the date of the offense. (Tr. at 196-97, 215.) Thus, the state was only required to prove that Mr. Elkhabiry purposely caused the death of Mr. Smith with the use of a firearm.

{¶ 43} A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A). Whether a person acts purposely "can be inferred from the manner in which the act is done and other circumstances in evidence." *State v. Boyd*, 10th Dist. No. 14AP-961, 2015-Ohio-5116, ¶ 21, citing *State v. Huffman*, 131 Ohio St. 27, 28 (1936), paragraph four of the syllabus. Mr. Elkhabiry was found hiding in the trunk of his girlfriend's car minutes after the shooting, and attempted to flee when caught. Two officers viewed a weapon in his hand when he emerged, and forensic evidence linked the weapon to the shooting. The intention to cause Mr. Smith's death can be inferred from the manner in which he was shot, as he suffered multiple gunshot wounds that entered from the back. After reviewing the evidence in the record and considering the testimony, evidence, and all reasonable inferences from the evidence, we conclude that the manifest weight of the evidence supported the jury's verdict finding Mr. Elkhabiry guilty of aggravated murder.

{¶ 44} Mr. Elkhabiry does not address his conviction for having a weapon while under disability in violation of R.C. 2923.13, a charge that was tried to the court and for which he was also found guilty. The relevant definition of the offense as charged provides that "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance * * * [who] has been convicted of any felony offense of violence." R.C. 2923.13(A)(2). Given that Mr. Elkhabiry stipulated to his conviction of aggravated robbery and the state produced the testimony of two police officers who saw him holding a handgun when he emerged from the car trunk, we conclude that the manifest weight of the evidence supported this charge as well. Accordingly, the second assignment of error is overruled.

{¶ 45} In the third assignment of error, Mr. Elkhabiry challenges the legal sufficiency of the state's evidence, asserting that the trial court erred when overruling his Crim.R. 29 motion for acquittal. Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). To test the sufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state*

*constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

{¶ 46}  Mr. Elkhabiry makes no argument challenging the sufficiency of the evidence other than to reiterate those raised when challenging the manifest weigh of the evidence. "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 11.  Having concluded that the manifest weight of the evidence supported the convictions, we necessarily conclude as well that the evidence was legally sufficient in that any rational jury could have found the essential elements of the charges Mr. Elkhabiry was indicted for proved beyond a reasonable doubt.  Accordingly, we overrule the third assignment of error.

## III.  Conclusion

{¶ 47}  Having concluded that Mr. Elkhabiry's Confrontation Clause rights were not violated by the admission of the videotaped statements of S.H., and that there is no merit to his challenges to the legal sufficiency or manifest weight of the evidence, we overrule his three assignments of error.  Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JAMISON, P.J. and EDELSTEIN, J., concur.

————————————————